**Robert DeCOE, Plaintiff–Appellant,**

v.

**GENERAL MOTORS CORPORATION; Debra A. Kline; Phyllis L. Evans; Karan S. Maurina; Marjorie E. Crocker–Hampton; Jerri Lynn Kronenweth; Ann M. Glynn; Roxanne M. Durham; and Cynthia S. White, Defendants–Appellees.**

No. 93–1225.

United States Court of Appeals, Sixth Circuit.

Argued May 12, 1994.

Decided July 25, 1994.

Glen N. Lenhoff (argued and briefed), Flint, MI, for plaintiff-appellant.

M. Beth Sax (argued and briefed), Gen. Motors Corp., Office of the Gen. Counsel and Ron D. Robinson, Asst. Atty. Gen. (argued and briefed), Office of the Atty. Gen. of Michigan, Detroit, MI, for defendants-appellees.

Leonard R. Page (briefed), Associate Gen. Counsel, International Union, UAW, Detroit, MI, for amicus curiae.

Before: RYAN and NORRIS, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

RYAN, Circuit Judge.

The plaintiff, Robert DeCoe, appeals a summary judgment dismissing his claims of slander, tortious interference with economic relations, conspiracy, and intentional infliction of emotional distress against his former employer, defendant General Motors Corporation. DeCoe's claims were made in response to publicized allegations made by De-Coe's former co-employees at GM, that De-Coe had sexually harassed them. The district court held that section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, preempted all of the plaintiff's claims. At issue on appeal is whether the plaintiff's proofs require interpretation of the collective bargaining agreement (CBA), or rely on a right created by the CBA. We conclude that they do, and therefore we agree with the district court that section 301 preempted all of the plaintiff's claims.

## I.

In 1987, the plaintiff, a tool and die maker employed by GM, ran for the union office of district committeeman for skilled trades at the GM Coldwater plant in Genesee County, Michigan. The plaintiff succeeded in his bid to become committeeman for the United Auto Workers, Local 326, and was reelected in 1990.

The CBA between GM and the UAW set forth the responsibilities of district committeemen, such as the plaintiff, to include the processing of grievances and appealed grievances, and, within specified time constraints, the handling of "other legitimate representation functions." The CBA also established the number of district committeemen allowed per plant, based on number of hourly employees. In addition, the CBA defined the qualifications necessary to hold the office, and set forth rights unique to committeemen, such as special seniority and recall privileges.

In March 1991, defendant Jerri Lynn Kronenweth complained to the labor pool committeeman, Jim Crossnoe, that the plaintiff had offered her $1,000 in exchange for sex. Kronenweth and most of the other individual defendants were employed in the labor pool, a group that the plaintiff openly had termed a "scab labor work force." Shortly after filing her grievance with Crossnoe, in June 1991, Kronenweth and the other individual defendants filed administrative charges with the Michigan Department of Civil Rights, alleging that the plaintiff had sexually harassed each of them.

GM maintained a detailed policy prohibiting sexual harassment, which GM and the

UAW had appended to the CBA. The policy provided, in relevant part:

> General Motors facilities must be free of hostility resulting from sexually-oriented behavior. It is the responsibility of management and each employe to maintain an environment free of hostility.
>
> ... [I]f you believe you have been subjected to sexual harassment, you may bring your concerns to the attention of either your immediate supervisor, personnel director or representative, or you may utilize appropriate and existing internal complaint procedures.

The following affirmation accompanied the policy statement:

> General Motors and the UAW are in agreement that complaints of sexual harassment should be dealt with promptly and fairly under existing internal procedures as provided under Paragraph (6a) of the National Agreement.

Pursuant to paragraph (6a) of the CBA, "The grievance and arbitration procedure shall be the exclusive contractual procedure for remedying ... discrimination claims." The grievance procedure, a four-step process included in the CBA, established the requirements for presenting a grievance to the employee's foreperson (step 1), appealing the grievance to the shop committee (step 2), appealing to GM and the International Union (step 3), and finally, appealing to an impartial umpire (step 4). If the grievance involved a sexual harassment claim, the CBA expressly provided that the shop committee had the option of handling it internally or delegating investigation and resolution to a member of the local union's civil rights committee.

In October 1991, the plaintiff filed his complaint in Genesee County, Michigan, Circuit Court, charging all defendants with slander, civil conspiracy, tortious interference, and intentional infliction of emotional distress. According to the complaint, GM's Coldwater plant manager, Al Herold, induced the individual defendants to take action against the plaintiff. The plaintiff alleged that the individual defendants were willing to defame him because they wanted to deprive him of his committeeman post. The plaintiff summarized the defendants' conduct as follows:

The combination of Plant Manager Herold's encouragement and the said political reason for seeking Plaintiff's discharge caused the individual Defendants in this case to file sham and spurious sex harassment complaints against Plaintiff and to state, on many occasions, to third persons in the plant, that Plaintiff had committed vulgar and offensive sexual touchings and had directed vulgar and obscene language toward them.

Herold was among the third persons to whom the statements allegedly were made. The plaintiff, who remained a GM employee and union official, claimed that the defendants' actions damaged his performance as a committeeman.

The defendants filed a timely petition removing the complaint to federal district court, on the basis that it was, in effect, an unfair labor practice claim under the National Labor Relations Act, 29 U.S.C. § 158(a), and that it was a claim for breach of a collective bargaining agreement pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The removal precipitated a remand motion, which the district court denied based on section 301 preemption.

Subsequently, GM and the individual defendants brought motions for summary judgment, seeking dismissal of the plaintiff's complaint based primarily on his failure to exhaust his contractual remedies. The plaintiff concurred in both motions, and in two orders, the district court dismissed all claims. On appeal, the plaintiff challenges the district court's refusal to remand the complaint.

## II.

■ Pursuant to Section 301 of the Labor Management Relations Act,

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Since 1962, the Supreme Court has held that section 301 preempts state law rules that substantially implicate the meaning of collective bargaining agreement terms. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 210, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985) (citing *Teamsters Local 174 v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962)). "[A] suit in state court alleging a violation of a provision of a labor contract must be brought under § 301 and be resolved by reference to federal law." *Id.* This rule is necessitated by the need for uniformity and predictability in interpreting the meaning of contract terms. *Id.* at 211, 105 S.Ct. at 1911.

■ As the Supreme Court has clarified, however,

> § 301 pre-emption . . . says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements. . . .
>
> [E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

*Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 409–10, 108 S.Ct. 1877, 1883, 100 L.Ed.2d 410 (1988) (footnote omitted). Thus, state courts may evaluate state law claims "involving labor-management relations only if such [claims] do not require construing collective-bargaining agreements." *Id.* at 411, 108 S.Ct. at 1884.

■ In light of these directives, we have developed a two-step approach for determining whether section 301 preemption applies. First, the district court must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms. *Terwilliger v. Greyhound Lines, Inc.,* 882 F.2d 1033, 1037 (6th Cir.1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2204, 109 L.Ed.2d 531 (1990). Second, the court must ascertain whether the right claimed by the plaintiff is created by the collective bargaining agreement or by state law. If the right both is borne of state law and does not invoke contract interpretation, then there is no preemption. However, if neither or only one criterion is satisfied, section 301 preemption is warranted. *Id. See also Smolarek v. Chrysler Corp.,* 879 F.2d 1326, 1331 (6th Cir.), *cert. denied,* 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989).

■ In order to make the first determination, the court is not bound by the "well-pleaded complaint" rule, but rather, looks to the essence of the plaintiff's claim, in order to determine whether the plaintiff is attempting to disguise what is essentially a contract claim as a tort. *Terwilliger,* 882 F.2d at 1037. If the plaintiff can prove all of the elements of his claim without the necessity of contract interpretation, then his claim is independent of the labor agreement. *Dougherty v. Parsec, Inc.,* 872 F.2d 766, 770 (6th Cir.1989). Moreover, neither a tangential relationship to the CBA, nor the defendant's assertion of the contract as an affirmative defense will turn an otherwise independent claim into a claim dependent on the labor contract. *Fox v. Parker Hannifin Corp.,* 914 F.2d 795, 800 (6th Cir.1990).

Here, the plaintiff in essence is claiming that the defendants exceeded the scope of CBA-imposed rights and duties, in their attempts to prosecute sexual harassment allegations. Thus, in each case, the plaintiff either invokes rights created by the collective bargaining agreement, or must make substantial reference to the CBA in order to establish an essential element of his claim.

### A.

The plaintiff first argues that his slander claims against the individual defendants, as well as against GM, are classic state law claims that do not involve interpretation of the collective bargaining agreement. In addition, on appeal, the plaintiff contends for the first time that his claim relates only to statements made by the individual defendants to coworkers. His belated contention, however, is not supported by his complaint or by the record.

In order to determine whether the plaintiff's defamation claim requires interpretation of the collective bargaining agreement, we must look to the elements of defamation under Michigan law. In Michigan, a defamation plaintiff must establish each of four elements:

> "(a) a false and defamatory statement concerning plaintiff; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod)."

*New Franklin Enterprises v. Sabo,* 192 Mich. App. 219, 480 N.W.2d 326, 328 (1991) (citation omitted), *appeal denied,* 439 Mich. 951, 482 N.W.2d 760 (1992). In ascertaining whether the plaintiff has satisfied the second element—that the publication was unprivileged—the court must keep in mind that " '[q]ualified privilege ... extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty.' " *Merritt v. Detroit Memorial Hosp.,* 81 Mich.App. 279, 265 N.W.2d 124, 127 (1978) (quoting *Bacon v. Michigan Cent. Ry. Co.,* 66 Mich. 166, 33 N.W. 181, 183 (1887)).

The plaintiff here primarily relies on a line of Ninth Circuit cases, none of which engaged in our two-step approach to section 301 preemption questions. For example, in *Tellez v. Pacific Gas & Electric Co.,* 817 F.2d 536 (9th Cir.), *cert. denied,* 484 U.S. 908, 108 S.Ct. 251, 98 L.Ed.2d 209 (1987), the Ninth Circuit summarily held that section 301 did not preempt a plaintiff's California law defamation claim, never analyzing the elements of defamation under relevant state law. *Id.* at 538. *See also Hayden v. Reickerd,* 957 F.2d 1506, 1509 (9th Cir.1991); and *Gulden v. Crown Zellerbach Corp.,* 890 F.2d 195, 198–99 (9th Cir.1989). Alternatively, the plaintiff relies on *Patillo v. Equitable Life Assurance Society,* 199 Mich.App. 450, 502 N.W.2d 696, 699 (1992), for the proposition that the individual defendants exceeded the scope of their privilege.

Here, the CBA between GM and the UAW incorporated a sexual harassment policy, which imposed a duty on GM, the individual defendants, and the UAW to identify and resolve harassment complaints. In addition, the CBA specified that sexual harassment claims were subject to its grievance and arbitration procedures. Pursuant to CBA negotiations, GM and the UAW even established committees to ensure that such claims were aired internally. Against this background, it is difficult to understand how the plaintiff could establish that the challenged publications were unprivileged—which was his burden under Michigan law—without interpreting the CBA provisions that identified the duties imposed on all defendants. His reliance on *Patillo* to establish the scope of any privilege emphasizes the risk a court takes when, acting without the benefit of the collective bargaining agreement, it attempts to define a duty incompatible with that established by the CBA.

An analogy may be drawn to the situation before the Supreme Court in *Lueck.* In that case, an issue was whether an insurer had breached its duty to process claims in a timely and nonarbitrary manner. Because the collective bargaining agreement governing the plaintiff's benefits established the manner for handling benefits claims, the court held that the CBA, not state law, set the terms of the insurer's duty. 471 U.S. at 216–18, 105 S.Ct. at 1913–15.

Accordingly, the district court properly held that section 301 preempted DeCoe's defamation claims. DeCoe's civil conspiracy claim, being derivative of his defamation claims, also was preempted. *See Stablein v. Schuster,* 183 Mich.App. 477, 455 N.W.2d 315, 318 (1990).

## B.

In support of his position that section 301 did not preempt his tortious interference claim, the plaintiff points to our prior decisions holding that such claims are subject to section 301 only if state law specifies contract breach as an element of the claim. Accord-

ing to the plaintiff, under Michigan law, he need not prove breach of contract, but rather need only demonstrate that the individual defendants' challenged conduct impacted on his business relationship.[1]

In *Dougherty*, we examined the elements of a tortious interference with contractual relations claim under Ohio law, and concluded that the claim was not preempted by section 301 because Ohio law does not require proof of breach. 872 F.2d at 770–71. All that is necessary is proof of some "interference ... that in some way affected the business relationship of [the plaintiff] and his employer." *Id.* at 770.

■ Unlike Ohio law, Michigan law does require a plaintiff to prove contract breach if he is to prevail on a tortious interference with contract claim. *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich.App. 300, 486 N.W.2d 351, 358 (1992), *appeal denied*, 442 Mich. 917, 503 N.W.2d 449 (1993). However, Michigan also recognizes the separate tort of tortious interference with a business relationship, a claim that does not require the plaintiff to prove either the existence of a contract or breach of that contract. All that need be shown is

> " 'the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.' "

*Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich.App. 361, 354 N.W.2d 341, 346 (1984) (citations omitted), *appeal denied*, (Mich. 1985). Here, the plaintiff's tortious interference claim—tortious interference with economic relations—more closely corresponds with interference with business relations.

■ Nevertheless, section 301 preempted the plaintiff's claim. As we recognized in *Jones v. General Motors Corp.*, 939 F.2d 380 (6th Cir.1991), preemption is required when "resolution of [the plaintiff's] claim will not involve the direct interpretation of a precise term of the CBA, but ... will require a court to address relationships that have been created through the collective bargaining process and to mediate a dispute founded upon rights created by a CBA," the second inquiry in our two-step process. *Id.* at 382–83. Here, the business relationship the plaintiff claims was damaged was created entirely by the CBA. Specifically, the plaintiff alleges that the "Defendants ... deliberately interfered with Plaintiff's job as a Local 326 committee man." The CBA established the rights and responsibilities of committeemen, as well as the relationship between a committeeman and his constituents, the employer, and the union. Accordingly, section 301 preempted this claim.

## C.

Finally, the plaintiff contends section 301 did not preempt his intentional infliction of emotional distress claim, because the factfinder only had to decide whether the defendants' dissemination of false sexual harassment charges was outrageous, a determination that would not require interpretation of the CBA.

While the Michigan Supreme Court has yet to recognize a cause of action for intentional infliction of emotional distress, the state's intermediate appellate court repeatedly has recognized such a claim, and we have permitted such claims to proceed on the theory that Michigan's highest court would recognize such an action. In addition, given *dicta* by the Michigan Supreme Court in *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985), we have held that Michigan would adhere to the tort as defined by the Restatement (2d) of Torts. *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 195 (6th Cir.1986). *See also Mroz v. Lee*, 5 F.3d 1016, 1018–19 (6th Cir.1993). Under this standard, " 'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress....' " *Polk*, 801 F.2d at 195 (quoting Restatement (2d) of Torts § 46

---

1. The plaintiff stipulated to the dismissal of his tortious interference claim against GM.

(1965)). The Restatement attaches stringent requirements on proof that a defendant's conduct was sufficiently outrageous: " 'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 196 (quoting Restatement (2d) of Torts § 46, comment d (1965)).

In this regard, the plaintiff relies on *Linebaugh v. Sheraton Michigan Corp.*, 198 Mich. App. 335, 497 N.W.2d 585 (1993), *appeal denied*, 512 N.W.2d 847 (Mich.1994), for the proposition that false allegations of sexual misconduct are inherently outrageous. In *Linebaugh*, the defendant employee drew and circulated a cartoon depicting the female plaintiff engaged in sex with a male coworker. The court concluded that, on these facts, summary disposition of the plaintiff's intentional infliction claim was unjustified because "a reasonable factfinder could conclude that the depiction ... constitute[d] conduct so outrageous in character and so extreme in degree that it goes beyond all bounds of common decency in a civilized society." *Id.* at 588.

■ However, as this court has noted, a defendant has not acted outrageously " 'where he has done no more than to insist upon his legal rights in a permissible way, even though he was well aware that such insistence [wa]s certain to cause emotional distress.' " *Polk*, 801 F.2d at 196 (quoting Restatement (2d) of Torts § 46, comment g (1965)). *See Roberts*, 374 N.W.2d at 909; *see also Early Detection Ctr., P.C. v. New York Life Ins. Co.*, 157 Mich.App. 618, 403 N.W.2d 830, 834 (1986).

At least two federal courts of appeals have interpreted section 46 of the Restatement (2d) to require preemption when the allegedly outrageous conduct arguably was governed by CBA provisions. *McCormick v. AT & T Technologies, Inc.*, 934 F.2d 531 (4th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 912, 116 L.Ed.2d 813 (1992); *Douglas v. American Info. Technologies Corp.*, 877 F.2d 565 (7th Cir.1989). In *Douglas*, the plaintiff complained that her employer acted

outrageously by denying her sick leave, giving her "an 'unjustified' final warning[,] and subject[ing] her to 'unwarranted and excessive' scrutiny of her work." 877 F.2d at 572. The Seventh Circuit held that section 301 preempted the plaintiff's intentional infliction claim because it was necessary to interpret the CBA, which governed such terms and conditions of employment, in order to determine whether the employer acted outrageously: "If [the employer's] conduct with regard to these matters was authorized under the collective bargaining agreement, then it would have been exercising its 'legal rights in a permissible way.' Such conduct cannot be characterized as 'extreme and outrageous' under Illinois tort law." *Id.* The Fourth Circuit, in *McCormick*, reached the same conclusion in finding that section 301 preempted a plaintiff's claim that his employer behaved outrageously in disposing of personal possessions kept in his locker, even though "management's rights and responsibilities regarding employee lockers are not explicitly delineated in the [collective bargaining] agreement." 934 F.2d at 536.

■ In contrast, the authorities cited by the plaintiff here rely on the standard announced by the Supreme Court in *Farmer v. United Brotherhood of Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), in which a plaintiff claimed that his union had acted outrageously in discriminating against him in hiring hall referrals. The problem with relying on the *Farmer* test is that *Farmer* was not a 301 preemption case, but rather involved preemption under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The goal of *Garmon* preemption is preservation of the National Labor Relations Board's primary jurisdiction over conduct violative of sections 7 and 8 of the National Labor Relations Act, 29 U.S.C. §§ 157 and 158. As such, the *Garmon* preemption test, which involves a balancing of state and federal interests, is inapplicable to section 301 preemption, which implicates Supremacy Clause concerns. *Lueck*, 471 U.S. at 212 n. 6, 105 S.Ct. at 1912 n. 6; *William E. Arnold Co. v. Carpenters Dist. Council of Jacksonville*, 417 U.S. 12, 16, 94 S.Ct. 2069, 2072, 40 L.Ed.2d

620 (1974). Application of the *Farmer* test could result in the court losing sight of the relevant inquiry under the section 301 test, which is whether the plaintiff is challenging a right created by the CBA, or must rely upon the CBA in order to prove an essential element of his claim. *Cf. Fox,* 914 F.2d at 802.

■ We conclude that section 301 preempted the plaintiff's intentional infliction of emotional distress claim. Pursuant to the Restatement (2d), reference must be made to the CBA in order to determine whether the defendants acted outrageously, or whether they merely pursued their legal rights " 'in a permissible way.' " *Polk,* 801 F.2d at 196. The plaintiff's reliance on *Linebaugh* is misplaced, because in that case the defendant admittedly was not pursuing any legal rights. 497 N.W.2d at 589.

### III.

For the aforesaid reasons, we **AFFIRM** the district court's summary judgment orders dismissing the plaintiff's complaint in its entirety.