82 F.3d 417
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Ruth DIX, Plaintiff-Appellant,
v.
SIEMENS INFORMATION SYSTEMS, INC.; Joseph Vetillo;
Dominick Caputo; and Siemens Nixdorf Printing
Systems, L.P., Defendants-Appellees.
 No. 94-1962.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1996.
 
 On Appeal from the United States District Court for the Eastern District of Michigan, No. 92-76341; Lawrence P. Zatkoff, Judge.
 E.D.Mich.
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 Before KENNEDY and MOORE, Circuit Judges, and JOHNSTONE, District Judge.*
 OPINION
 MOORE, Circuit Judge.
 
 
 1
 Ruth Dix appeals the district court's order granting the defendants' motion for summary judgment in this diversity case. We affirm in part, reverse in part, and remand.
 
 
 2
 * In 1985 Siemens Nixdorf Information Systems, a European manufacturer of high speed printers, created an American subsidiary to distribute its printers in the U.S.[1] The head of U.S. sales, Dominick Caputo, hired Joseph Vetillo to supervise sales in the Midwest. When Siemens decided to expand its Midwest region in 1987 by opening an office in Detroit, Vetillo hired Ruth Dix as one of the company's two Detroit sales representatives.
 
 
 3
 Each year, Siemens calculated its national sales goal and divided that figure by the number of its salespeople nationwide, resulting in a uniform annual sales quota for each salesperson. Dix attained that goal only once in her five years at Siemens, and that was in a year in which she was temporarily the lone Siemens sales representative in Detroit. In fact, by May 1992, Dix ranked last in sales among the company's forty-six salespeople nationwide.
 
 
 4
 Vetillo and Caputo then placed Dix on a Performance Improvement Plan (a "PIP"). PIPs set short-term sales goals for employees with unacceptable sales performance. The salesperson usually had about ninety days to generate a specified amount of business; failure to meet a PIP's goals could result in termination. Dix's PIP required her to secure $600,000 in new orders over a ninety-day period beginning June 1, 1992. These requirements were comparable to those used in other PIPs. By the end of the ninety-day period, Siemens found that Dix had sold less than $125,000 worth of printers. She was fired on August 31, 1992.
 
 
 5
 Dix subsequently filed suit in Michigan state court, alleging state law claims of (1) sex discrimination due to a hostile work environment, (2) intentional sex discrimination, (3) intentional infliction of emotional distress, (4) breach of employment contract, (5) tortious interference with a business relationship, and (6) sexual harassment by Vetillo. After removing the case to federal court on the basis of diversity jurisdiction, the defendants moved for summary judgment on all counts. The district court granted the motion and subsequently denied Dix's motion to reconsider.
 
 II
 
 6
 We review a grant of summary judgment de novo. City Management Corp. v. U.S. Chem. Co., 43 F.3d 244, 250 (6th Cir.1994). All facts and inferences drawn therefrom are considered in the light most favorable to the appellant. Id. Reversal is warranted if the appellant can demonstrate the existence of a genuine issue of material fact, such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
 
 B
 
 7
 Dix attributes her lack of sales success and consequent termination to systematic sex discrimination. She cites a number of ways in which Vetillo treated her differently from her male counterparts, including use of abusive language, approval of expense accounts, willingness to allow pricing promotions, limitation of geographic sales area, access to trade shows, assignment of profitable accounts, and attention to legitimate business needs. She also details specific instances of inappropriate conduct on Vetillo's part. For instance, in 1987 Vetillo was drunk at a company function and began abusively to criticize some of Dix's business techniques, refusing to stop until Dix left the party. He also once told her that she did not need to work because her husband had a good job, and he mentioned to another employee in Dix's hearing that he did not "need women in sales" because he "ha[d] enough of them at home and they cause enough trouble." He indicated to his secretary that women should be at home "where they belong," told some female job applicants that not getting pregnant was a job requirement, and kept a pornographic display on his office's computer screen. The record also reveals that Vetillo routinely used foul and sexist language in his Chicago workplace; he frequently uttered terms such as "bitch," "lesbo," "bimbo," "cunt," "skirt," and "on the rag."
 
 
 8
 Based on these incidents and other alleged discriminatory actions by Siemens management, Dix brought three claims under Michigan's Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. §§ 37.2101-.2804: (1) sexual harassment through the creation of a hostile work environment, in violation of Mich.Comp.Laws Ann. § 37.2202; (2) discriminatory treatment in the conditions of her employment, in violation of Mich.Comp.Laws Ann. § 37.2202; and (3) retaliation for her complaints of sex discrimination, in violation of Mich.Comp.Laws Ann. § 37.2701.
 
 
 9
 * Under the Elliott-Larsen Act, "[d]iscrimination because of sex includes sexual harassment which means ... verbal or physical conduct or communication of a sexual nature when ... [s]uch conduct or communication has the purpose or effect of ... creating an intimidating, hostile, or offensive employment ... environment." Mich.Comp.Laws Ann. § 37.2103(i).[2] Five elements are necessary to prove a hostile environment claim:
 
 
 10
 (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.
 
 
 11
 Radtke v. Everett, 501 N.W.2d 155, 162 (Mich.1993) (footnote omitted).
 
 
 12
 We find that the evidence in the record, when viewed in the light most favorable to Dix, does not create a genuine issue of fact material to the fourth Radtke element. Almost all of Vetillo's abusive language and sexist comments occurred in the Chicago office where he worked rather than in Detroit where Dix worked. Dix herself admits that she never heard Vetillo use any of the offensive terms listed above. Although incidents that occurred out of Dix's presence might be relevant to her hostile environment claim if she were aware of them, see Langlois v. McDonald's Restaurants of Mich., Inc., 385 N.W.2d 778, 781-82 (Mich.Ct.App.1986), the record shows that during her five years at Siemens Dix personally had to put up with occasional non-sexual, non-sexist vulgarities and two clearly sexist comments. This evidence is insufficient to support a finding that Vetillo's behavior created an intimidating, hostile, or offensive work environment in Detroit. Summary judgment on this claim was therefore correct.
 
 2
 
 13
 Dix's second sex discrimination claim alleges that Siemens's management intentionally discriminated against her in business decisions because she was a woman, resulting in the poor performance that led to her termination. To avoid summary judgment on this claim, Dix must show either that she was treated differently from her male counterparts, see Schultes v. Naylor, 491 N.W.2d 240, 242 (Mich.Ct.App.1992) ("disparate treatment" approach), or that Vetillo's obvious anti-women animus motivated the adverse employment decisions that caused her poor performance, see id. at 243 ("intentional discrimination" approach). The record, however, contains no direct evidence that Vetillo's sexist predisposition prompted any of his business decisions, and the relevant circumstantial evidence of illicit motivation is the same evidence that Dix would use under the disparate treatment approach, i.e., indications that Vetillo favored his male employees. The intentional discrimination and disparate treatment approaches therefore turn on the single issue of whether Dix was treated differently from her male coworkers.
 
 
 14
 A thorough review of the record, viewing all evidence in the light most favorable to Dix, reveals no genuine issue of fact material to Dix's claim. Most of the examples of allegedly discriminatory conduct are simply recitations of unprofessional behavior or unfavorable business decisions, accompanied by unsubstantiated assertions that male salespeople were not subject to the same treatment. For instance, Dix argues that Siemens wrongfully failed to count a certain contract toward her PIP goals, but fails to show that her male counterparts' PIPs were administered differently. Her complaints about allocation of territory, adequacy of sales support, and availability of travel perks are similarly deficient.
 
 
 15
 Nor does the record support the few specific comparisons Dix does try to draw to her male colleagues. Dix claims that Vetillo's assignment of a valuable sales opportunity, the R.L. Polk account, to the other Detroit sales representative was discriminatory. The other salesperson, however, was also a woman. Dix tries to avoid this problem by arguing that Vetillo would not have interfered in account allocation if both the Detroit salespeople had been male; she points to the handling of an account with State Farm as proof. The record, however, clearly shows that Vetillo was the one who made the decision as to which of two male representatives would get to handle the State Farm account. Likewise, only Dix's own unverified handwritten figures support her claim that male salespeople received better pricing concessions than their female colleagues, whereas depositions from other female sales representatives and Dix's own admissions regarding price breaks she received warrant a contrary conclusion.
 
 
 16
 In short, the district court correctly granted summary judgment on Dix's intentional discrimination claim. Her poor performance may have been due to decisions that Siemens made, but she has not created a genuine issue of fact material to a claim that an anti-female animus motivated those decisions.
 
 3
 
 17
 We next turn to Dix's retaliation claim. Viewed in the light most favorable to Dix, the record shows that in October 1991 she and other employees under Vetillo's supervision began to complain to Siemens's human resources department about Vetillo's conduct. Dix was particularly active in protesting Vetillo's behavior, and she characterized it as sex discrimination. In early 1992, Harry J. Hamilton, the head of human resources for Siemens, came to Chicago to investigate the allegations. Hamilton met individually with some employees, and he and Caputo also called a meeting of all the Midwest region's sales representatives at which a few salespeople, including Dix, expressed their concerns. Although the details of the group meeting are sketchy, Caputo apparently reacted very strongly, defending Vetillo in a confrontational manner and discouraging the sales staff from voicing their complaints. The salespeople emerged from the meeting feeling shaken; Dix was crying. She subsequently canceled her individual meeting with Hamilton, despairing that Siemens would ever do anything about Vetillo's conduct.
 
 
 18
 Vetillo did not attend the group meeting, but was aware that it was taking place and knew either before or shortly thereafter that it was about him. A number of his employees expressed fear that Vetillo would retaliate against the "confirmers," Vetillo's term for those who had lodged complaints. Vetillo apparently stated on more than one occasion, "If you go to Human Resources you are fucked. If you go to Dom Caputo he is going to tell me about it anyway." Frangella 7/22/93 Aff. p 13. Even Hamilton, whose deposition was generally quite favorable to Vetillo, admitted that "there was [sic] some general feelings that [Vetillo] would retaliate" against anyone who complained about him. Hamilton Dep. at 41.
 
 
 19
 The Elliott-Larsen Act prohibits retaliation against an individual for opposing a violation of its provisions. Mich.Comp.Laws Ann. § 37.2701. In order to prove retaliation, an employee must show that (1) he or she opposed violations of the Act and (2) the opposition was a significant factor in an adverse employment decision. Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1310 (6th Cir.1989).
 
 
 20
 * The first issue is whether Dix's actions invoked the protection of the Elliott-Larsen Act. Booker held that "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." 879 F.2d at 1313. The court thus found that an isolated reference to an employer's "ethnocism" in a letter sent to the company's human resources department was not opposition to discrimination within the meaning of Mich.Comp.Laws Ann. § 37.2701(a). Id. at 1313-14. In contrast, the record here, viewed in the light most favorable to Dix, indicates repeated and explicit complaints about sex discrimination through a series of conversations and correspondence with the human resources department, beginning in October 1991. Such actions are more than a vague, isolated reference to discrimination. Furthermore, a Michigan appellate court decision has indicated that Booker misconstrued Michigan law:
 
 
 21
 We strongly disagree with [Booker 's] interpretation of the act. Regardless of the vagueness of the charge or the lack of formal invocation of the protection of the act, if an employer's decision to terminate or otherwise adversely effect [sic] an employee is a result of that employee raising the spectre of a discrimination complaint, retaliation prohibited by the act occurs.
 
 
 22
 McLemore v. Detroit Receiving Hosp., 493 N.W.2d 441, 443 (Mich.Ct.App.1992), appeal denied, 506 N.W.2d 877 (Mich.1993). Any number of Dix's actions can be viewed as "raising the spectre of a discrimination complaint." Dix's complaints in October 1991 and thereafter thus constituted protected opposition to discrimination.
 
 
 23
 b
 
 
 24
 The inquiry next shifts to whether Dix's complaints were a "significant factor" in the decision to fire her. See Booker, 879 F.2d at 1310. A threshold issue is whether the decisions that led to Dix's discharge were made with the knowledge that she had complained of sex discrimination. Caputo certainly knew of Dix's grievances, but the record contains no evidence that a retaliatory motive might have fueled any of Caputo's actions. Vetillo, on the other hand, vowed to retaliate against those who complained about him, but there is no direct evidence that he knew that Dix had been a complainant.
 
 
 25
 The circumstantial evidence, however, creates a genuine issue of fact material to Vetillo's knowledge. Although Dix's grievances were initially off the record, she eventually allowed her name to be used when the management discussed what to do about Vetillo. By the time she spoke out in front of Caputo and her colleagues at the February 1992 meeting, she clearly was no longer reticent about letting her views be known. As noted above, Vetillo himself declared that Caputo would tell him who had complained. Vetillo also admitted in his deposition that he had asked Caputo shortly after the group meeting who had leveled charges against him, although Vetillo maintained that Caputo had not responded. This evidence is not necessarily compelling, but it is sufficient to create a jury question.
 
 
 26
 Even if Vetillo knew of Dix's complaints, summary judgment was appropriate if the complaints were not a significant factor in Dix's termination. The significant factor standard is less exacting than a "but for" test, but requires more than a mere causal link. Polk v. Yellow Freight Sys., Inc., 801 F.2d 190, 199 (6th Cir.1986). In Polk, the employee had requested to see her personnel file and was fired soon thereafter. The court held that this coincidental timing alone was insufficient evidence for a jury to conclude that the employee's request was a significant factor in the decision to terminate her. Id. at 197. In contrast, the jury could reasonably have viewed the employee's visit to the Michigan Civil Rights Commission shortly before her termination as a significant factor in her firing because her employer remarked, "I know you went down to the Civil Rights office." Id. The court so held despite the existence of plausible non-discriminatory reasons for the discharge. See id. at 192 (describing four disciplinary incidents in the eight months preceding termination).
 
 
 27
 Like the employer in Polk, Siemens had a legitimate reason for firing its employee: her poor sales performance and failure to complete the requirements of her PIP. Vetillo's declarations of intent to retaliate, however, cast doubt on whether the decision to fire Dix was motivated solely by this legitimate concern; discussions regarding placing Dix on the PIP that eventually led to her termination began just a few weeks after the February 1992 group meeting between Vetillo's staff (including Dix), Caputo, and Hamilton to discuss Vetillo's behavior. Moreover, Dix steadfastly maintains that she would have improved her sales performance and satisfied the PIP's criteria if Vetillo had not prevented her from doing so. For instance, she asserts that Vetillo informed her that a trial agreement with Chrysler Corporation would count toward her PIP goals if she could procure a schedule of when the printers would be installed. Despite producing what she claims was a suitable document, the Chrysler agreement was not counted toward her PIP goals. In the absence of evidence of retaliatory motive, the Chrysler issue could be seen as a simple misunderstanding. Given Vetillo's statements, however, such a misunderstanding takes on a potentially more sinister meaning, especially when viewed in the light most favorable to Dix. The district court should not have granted summary judgment on the retaliation claim because a genuine issue of material fact did exist.
 
 C
 
 28
 Dix next argues that the conduct of Siemens management throughout her career there intentionally caused her severe emotional distress. The Michigan Supreme Court has not yet recognized the tort of intentional infliction of emotional distress, see Roberts v. Auto-Owners Ins. Co., 374 N.W.2d 905, 912 (Mich.1985), but this circuit has assumed that Michigan would follow the Restatement (Second) of Torts in allowing such a cause of action. See DeCoe v. General Motors Corp., 32 F.3d 212, 218 (6th Cir.1994). Under the Restatement, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for emotional distress." Restatement (Second) of Torts § 46 (1965).
 
 
 29
 We agree with the district court that Dix has failed to present a triable issue of "severe emotional distress." Dix's alleged mental and emotional suffering was not "so severe that no reasonable man could be expected to endure it." Id. § 46 cmt. j. Rather, it was merely the discomfort that members of the workforce endure every day. During her employment she would wake up in the middle of the night about once a month and not be able to get back to sleep. After being fired, she felt ashamed, irritable, and detached, had trouble concentrating, and had to take a less rewarding job "for fear of remaining unemployed." Even when viewed in the light most favorable to Dix, this distress falls short of the severity that Michigan law requires. See, e.g., Johnson v. Wayne County, No. 169802, 1995 WL 546046, at * 8-9 (Mich.Ct.App. Sept. 1, 1995) (finding triable issue when plaintiff had a mental breakdown and had to be hospitalized). The district court correctly granted summary judgment on the emotional distress claim.
 
 D
 
 30
 Dix also claims that Siemens breached an employment contract by firing her without just cause. The district court granted summary judgment on this claim partly because it concluded that legitimate business considerations justified Dix's discharge. To the extent that Vetillo's retaliatory intent influenced the termination decision, however, the termination was not just.
 
 
 31
 Nevertheless, a retaliatory dismissal is not actionable as breach of contract unless there was some contract to breach. The Michigan Supreme Court has held that a discharged employee can prove that a contract existed by showing either that there was a negotiated "just cause" agreement between the parties (the "contract" approach) or that the employer's unilateral policy statements justified a belief throughout the workplace that employees would be terminated only for just cause (the "legitimate expectations" approach). See Rood v. General Dynamics Corp., 507 N.W.2d 591, 597-98 (Mich.1993); Touissant v. Blue Cross & Blue Shield of Mich., 292 N.W.2d 880, 885, 892 (Mich.1980).
 
 
 32
 Dix argues that an employment manual that refers to termination as a last resort to be used in "situations [that] would normally encompass just cause issues," see Dix 1/13/93 Aff.Ex. B, establishes a company policy of dismissal for just cause. Dix admits, however, that the manual was not distributed to employees and that she never saw it until she requested information in June 1992. The manual's policy is therefore not relevant to the contract approach because it was not an issue in Dix's hiring or in any other situation that involved negotiation or exchange of consideration. See Rood, 507 N.W.2d at 598 (noting that contract approach emphasizes mutual assent of parties to just cause policy). Nor is it relevant to the legitimate expectations approach; a policy has to be known throughout the workforce to create a legitimate expectation of just cause employment. See id. at 606 & n. 31 (holding that legitimate expectations approach applies only to policies disseminated throughout workforce).
 
 
 33
 Other evidence in the record, however, creates a genuine issue of fact material to a legitimate expectations claim. Dix's deposition states that when she began working for Siemens she and other new employees were told that they could expect long-term employment as long as they performed adequately. Such statements, if routinely given to new employees, can be seen as comprising a generally promulgated policy, especially given the record's clear indications that Siemens management followed a practice of dealing with underachieving salespeople through PIPs and would only fire those who failed to meet a PIP's requirements. The combination of assurances made upon hiring and a formalized method of just-cause termination could reasonably lead to the conclusion that such a method was the only means of termination. "[I]f an employer elects to create policies and procedures that are reasonably capable of being interpreted as promises to refrain from discharging employees absent just cause, it is for the jury to determine whether such policies and procedures instilled a legitimate expectation of just-cause employment." Id. at 609. The jury should determine whether Dix's termination breached a contract created by the legitimate expectations of Siemens employees.
 
 E
 
 34
 Dix's last claim is that Vetillo tortiously interfered with her business relationship with Siemens. This circuit has stated that the elements of this tort under Michigan law are: (1) the existence of a valid business relation, not necessarily evidenced by a contract; (2) knowledge of the relationship on the part of the defendant; (3) intentional interference causing a breach or termination of the relationship; and (4) resultant damage to the plaintiff. DeCoe v. General Motors Corp., 32 F.3d 212, 218 (6th Cir.1994); accord Safie Enterprises, Inc. v. Nationwide Mut. Fire Ins. Co., 381 N.W.2d 747, 753 (Mich.Ct.App.1985). Because Dix is bringing this claim against a Siemens employee rather than a third party, she must also prove that he acted solely for his own benefit and not for Siemens's. See Reed v. Michigan Metro Girl Scout Council, 506 N.W.2d 231, 233 (Mich.Ct.App.1993); Feaheny v. Caldwell, 437 N.W.2d 358, 364 (Mich.Ct.App.1989).
 
 
 35
 Dix has not established that Vetillo acted solely for his own benefit as that requirement is interpreted under Michigan law. Even when viewing the evidence in the light most favorable to Dix, no reasonable juror could find that business reasons played no part in Vetillo's adverse employment decisions. Part of Vetillo's job was to recommend Dix's firing or continued employment. His actions, even if partly motivated by a retaliatory intent, were neither "strictly personal" nor "solely for [his] own benefit with no benefit to the corporation." See Reed, 506 N.W.2d at 233. Summary judgment on this claim was therefore proper.
 
 III
 
 36
 Finally, we address Dix's argument that the district court's grant of summary judgment was premature because several discovery requests were still pending. This court recently held that we will not consider claims of premature summary judgment unless the appellant alerted the district court to the need for further discovery. See Plott v. General Motors Corp., 71 F.3d 1190, 1196 (6th Cir.1995), petition for cert. filed, 64 U.S.L.W. ---- (U.S. Mar. 13, 1996) (No. 95-1466). Because Dix neither submitted an affidavit under Federal Rule of Civil Procedure 56(f) nor suffered an adverse discovery ruling, she has not preserved this claim for appeal. See id.
 
 
 37
 For the foregoing reasons, we REVERSE the district court's grant of summary judgment on the claims of retaliation and breach of employment contract and REMAND those issues for trial. We AFFIRM the district court's decision in all other respects.
 
 
 38
 KENNEDY, Circuit Judge. Concurring in part and dissenting in part.
 
 
 39
 I concur in parts I, IIA, B, 1, 2, C and III of the majority opinion.
 
 
 40
 I cannot agree that plaintiff has created an issue of fact on either her breach of contract claim or retaliatory discharge claim. Plaintiff's retaliatory discharge claim is not dependent on a just-cause contract. Retaliation is actionable regardless of the employment arrangement. Suchodolski v. Michigan Consolidated Gas Co., 412 Mich. 692, 695 & n. 2 (1982); see also Phillips v. Butterball Farms, 448 Mich. 239, 248-49 (1995) (at-will employee's cause of action for retaliation arises from state statute, not employment contract, and sounds in tort, not contract). She has, however, claimed a breach of just cause contract. I am unable to agree with the majority that the evidence permits the finding of such a contract here.
 
 
 41
 I am unable to agree that because 1) Siemens had a "practice of dealing with underachieving employees through PIPs," and 2) "[Dix] and other new employees were told that they could expect long-term employment as long as they performed adequately" a jury could reasonably conclude that there was just-cause employment. I believe that this holding is a misapplication of Michigan law.
 
 
 42
 With regard to employment practices, the Michigan Supreme Court has stated that "in all claims brought under the legitimate expectations theory ... [the] court should examine the employer policy statements, concerning employee discharge, if any, to determine, as a threshold matter, whether such policies are reasonably capable of being interpreted as promises of just-cause employment." Rood v. General Dynamics Corp., 444 Mich. 107, 140 (1993). Even assuming that the PIP policy concerns employee discharge, it amounts to nothing more than a "second chance" for Dix to try and meet her sales quota. It cannot, without more, reasonably be interpreted as a promise of just-cause employment.
 
 
 43
 Similarly, the oral statements made to Dix are insufficient to create just-cause employment. In Rowe v. Montgomery Ward, 437 Mich. 627, 642-43 (1991), a sales person claimed that when she was hired by a department store, she was told that "as long as I sold, I would have a job at Montgomery Wards." Id. at 642. The Court found this statement to be an expression of "optimistic hope of a long relationship" that was "insufficient to rise to the level of an agreement providing termination only for just cause." Id. at 643. Likewise, in Rood, a truck driver was told by his immediate supervisor that "as far as he was concerned, unless something was really wrong, [plaintiff] would be there for retirement." 444 Mich. at 120. Notwithstanding similar assurances from other management personnel, the Court concluded that the statements were insufficient to create just-cause employment. Id. at 127.
 
 
 44
 Finally, I would affirm the District Court's holding that plaintiff failed to create an issue of fact that the reason given for discharge of plaintiff, her extremely poor performance, was pretextual. While there is evidence of Vetillo's vow to retaliate against plaintiff, there is no evidence that Vetillo's intent influenced the termination decision made by Caputo.
 
 
 45
 The majority points to the fact that plaintiff was placed on PIP as evidence of retaliatory discharge. The evidence before the court is that all the poorly performing sales persons were placed on a PIP. Further, Siemens management began discussing Dix's poor performance and the possibility of replacing her in January of 1991--ten months prior to Vetillo learning of Dix's complaint. (Caputo dep. at 15-6). This seems to me to further undermine Dix's claim that she was placed on a PIP in June of 1992 out of retaliation, especially given the fact that between January of 1991 and June of 1992 her sales only declined.
 
 
 46
 Plaintiff argues that Siemens should have counted her efforts toward securing a contract for Chrysler in determining whether she met her PIP and that the refusal to do so was in retaliation for her complaints against Vetillo.
 
 
 47
 The record is clear that plaintiff's PIP, which was in writing, did not include trial agreements; it only included "approved contracts" for sales. (JA at 164; Caputo dep. at 34-5). Further, even if Vetillo told Dix that the trial agreement would be counted, it could not have been, since Caputo had authority for PIP accounting (along with Callahan) and would not have counted a trial agreement. (Caputo dep. at 56). Where is the evidence that not counting the trial agreement could have been because of retaliatory acts by Vetillo?
 
 
 48
 The majority attaches considerable significance to the timing in placing plaintiff on PIP as circumstantial evidence of retaliation. But it was after she was placed on PIP that the promise by Vetillo to include the Chrysler Trial Agreement was made. Since that promise was not required, it seems to exclude the likelihood that placing her on PIP was retaliatory.
 
 
 49
 I would affirm the District Court in full.
 
 
 
 *
 The Honorable Edward H. Johnstone, United States Senior District Judge for the Western District of Kentucky, sitting by designation
 
 
 [1]
 The subsidiary was called Siemens Information Systems ("SIS"). In 1991, SIS entered into a joint venture with a competitor, Storage Technology Corporation, to form Siemens Nixdorf Printing Systems ("SNPS"). At one point, SIS, Siemens Nixdorf Information Systems ("SNIS"), and SNPS were all defendants in this litigation, but the district judge dismissed SNIS several months before ruling on the other defendants' summary judgment motions. Because Dix has not contested the dismissal of SNIS from the suit, only SIS, SNPS, and the individual defendants are appellees here. We will refer to them collectively as "Siemens."
 
 
 [2]
 Count one of Dix's complaint alleges that the defendants violated the Elliott-Larsen Act's sexual harassment prohibitions through the creation of a hostile work environment. Count six also refers to a sexual harassment claim, but does not indicate its statutory or common-law basis. Both in the district court and on appeal, Dix has based her sexual harassment argument only on a hostile environment approach. We therefore use only that approach as well