**In re The PRUDENTIAL INSURANCE COMPANY OF AMERICA SALES PRACTICES LITIGATION.**

**This Document Relates to All Actions.**

**MDL No. 1061.
Civ. No. 95–4704.**

United States District Court,
D. New Jersey.

April 19, 1996.

Allyn Lite, Goldstein, Till & Lite, Newark, NJ, Liaison Counsel, for Plaintiffs.

Reid L. Ashinoff, Michael Barr, Sonneschein, Nath & Rosenthal, New York City, Lead Counsel, for the Prudential Insurance Company.

J. Bruce Miller, Louisville, KY, Liaison Counsel, for Plaintiff "Agent Class".

---

1. Gordon has not contested Prudential's motion to compel arbitration. Accordingly, the terms of his U–4 are not at issue.

 *OPINION*

WOLIN, District Judge.

### *FACTUAL BACKGROUND*

This motion is part of a large group of cases against defendant Prudential Insurance Company of America ("Prudential") which have been transferred to this Court for coordinated pretrial proceedings under 28 U.S.C. § 1407 pursuant to the order of the Judicial Panel on Multidistrict Litigation. The majority of these cases involve allegations by current and former Prudential policyholders that the company engaged in various illegal sales practices. The cases at issue on this motion are part of a smaller subset of cases, in which certain former Prudential sales agents allege that Prudential took adverse employment actions against them because they refused to participate in these illegal practices. Plaintiffs Michael R. Weaver ("Weaver"), Herbert Schulte ("Schulte"), Rick A. Martin ("Martin"), Kenneth R. Young ("Young") and Michael D. Gordon ("Gordon") (collectively, for purposes of this motion, the "agents") assert such claims.

At some point in the course of each of the agents' employment at Prudential, they became eligible to sell insurance products which, at least in Prudential's view, constituted securities. Accordingly, each signed a Uniform Application for Securities Industry Registration or Transfer ("U–4").[1] Young signed two U–4s, the first in 1988 and the second in 1993 when, after his 1992 retirement, Prudential allegedly retained his services as an "agent emeritus." (Young Opp. Br. p. 3) Although the agents' U–4s differed in minor respects, for purposes of this motion they were essentially the same. For example, Young's 1988 U–4 read, in relevant part:

2. I hereby apply for registration with the organizations and states indicated in Item 10 as may be amended from time to time [*i.e.*, the NASD][2] and, in consideration of such organizations and states receiving and considering my application, I submit myself to the jurisdiction of such states and organizations and hereby certify

---

2. Each plaintiff's U–4 listed the National Association of Securities Dealers ("NASD") as an organization with which he was to register.

that I agree to abide by, comply with, and adhere to all the provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the states and organizations as they are and may be adopted, changed or amended from time to time, and I agree to comply with, be subject to and abide by all such requirements and all rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by such states and organizations, subject to right of appeal as provided by law; . . .

5. I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register, as indicated in Item 10 as may be amended from time to time.

Insofar as is relevant to this motion, Weaver's U–4 and Young's 1993 U–4 contained the same provisions. Martin and Schulte, on the other hand, signed an earlier version of the U–4 which differed slightly in two ways: (1) in paragraph 2, in addition to certifying that they agreed to abide by, comply with and adhere to the provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the NASD, Martin and Schulte attested: "I . . . have read and understand" these provisions and rules; and (2) in para-

graph 5, their U–4s do not contain the language "as may be amended from time to time" at the end of the sentence.[3]

Interpretation of the NASD arbitration provisions—and a determination of which provisions were in effect at various times—are central issues on this motion. Effective October 1, 1993, the NASD amended its Code in respects that are critical to this motion (the "1993 amendment"). Although each agent was terminated before the 1993 amendment took effect, they all filed their actions after that date.[4]

Two provisions of the NASD Code are chiefly relevant. Under its postamendment formulation, Part I Section 1 ("section 1") sets forth generally the matters *eligible* for arbitration:

any dispute, claim, or controversy arising out of or in connection with the business of any member of the [NASD], or arising out of the employment or termination of employment of associated person(s) with any member,[5] with the exception of disputes involving the insurance business of any member which is also an insurance company:

(1) between or among members;

(2) between or among members and associated persons;

(3) between or among members or associated persons and public customers, or others;[6] and

---

3. The Court finds this second difference insignificant. Under ordinary rules of grammar and syntax, the quoted phrase from the later version modifies the language immediately preceding it, *i.e.*, "as indicated in Item 10." In other words, the "as amended" language refers to the list of organizations with which the signing agent has registered, not to the rules and regulations of these organizations. This interpretation finds further support in the fact that a similar phrase, "registration with the organizations and states indicated in Item 10 as may be amended from time to time," appears in paragraph 2 of the later version. Thus, neither version specifically requires the agents to abide by the NASD arbitration rules "as amended;" however, such a specific provision was not necessary in light of the agents' clear agreement in paragraph 2 of the U–4 to comply with *all* NASD rules and regulations "as amended." *See Wojcik v. Aetna Life Ins. and Annuity Co.*, 901 F.Supp. 1282, 1289 (N.D.Ill.), *clarified*, 916 F.Supp. 729 (N.D.Ill.). The reason

paragraph 5 appears as a separate requirement is probably to alert agents who sign the U–4 that their claims may be subject to arbitration under NASD rules.

4. For purposes of the arbitration discussion in this Opinion, "agents" will refer to Schulte, Weaver, Young and Martin. As noted above, Gordon has not contested Prudential's motion to compel arbitration at this time.

5. The preamendment version did not contain the language "or arising out of the employment or termination of employment of associated person(s) with any member."

6. Subparts 2 and 3 were also amended in 1993. The pre-amended version contained only 3 subparts, the second of which read "between or among members and public customers, or others. . . ." Thus, the preamended version of Sec-

(4) between or among members, registered clearing agencies with which the [NASD] has entered into an agreement to utilize the [NASD] arbitration facilities and procedures, and participants, pledges, or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency.

Part II Section 8 ("Section 8") defines which disputes *must* be arbitrated:

(a) Any dispute, claim, or controversy eligible for submission under Part I of this Code between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member,[7] shall be arbitrated under this Code, at the instance of:

(1) a member against another member;

(2) a member against a person associated with a member or a person associated with a member against a member; and,

(3) a person associated with a member against a person associated with a member.

Even under its preamendment version, section 8 contemplated arbitration between members and persons associated with a member.

In addition, plaintiffs Gordon, Weaver and Schulte were, during their employment with Prudential, members of the United Food & Commercial Workers International Union (the "union").[8] Accordingly, their employment was governed by the terms of a collective bargaining agreement between Prudential and the union (the "CBA").[9] Pursuant to Labor Management Relations Act § 301, cer-

tain state law causes of action which they might otherwise be entitled to bring against Prudential may be preempted by the CBA.

## DISCUSSION

### PRUDENTIAL'S MOTION TO COMPEL ARBITRATION

■ The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–9 (1988), governs enforcement of arbitration agreements contained in U–4s. *See Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Under 9 U.S.C. § 2, a written agreement to arbitrate in a contract evidencing a transaction involving commerce is "valid, irrevocable and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." Congress enacted the FAA in 1925 "to 'reverse centuries of judicial hostility to arbitration agreements.'" *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 225, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987), *quoting Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 510, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974). The statute accordingly "establishes a federal policy favoring arbitration," requiring that Courts "rigorously enforce agreements to arbitrate." *Id.* (citations omitted). The Courts have taken this directive seriously, holding that the intent of the FAA was to leave "no place for the exercise of discretion by the district court...." where an agreement can be construed to require arbitration. *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985).

■ On the other hand, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106

---

tion 1 did not specifically authorize arbitration between members and "associated persons."

**7.** The preamendment version did not contain the language "or arising out of the employment or termination of employment of such associated person(s) with such member."

**8.** For purposes of the preemption discussion in this Opinion, "agents" will refer to Gordon, Schulte and Weaver.

**9.** Over the course of the various agents' employment at Prudential, various versions of the CBA governed. As none of the differences are germane to this dispute, this Court's references will be to a single CBA.

S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986), *quoting United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). In other words, the FAA makes arbitration agreements "as enforceable as any contract, not more so." *Moore v. Interacciones Global, Inc.,* 1995 WL 33650, *2 (S.D.N.Y.). *See also Armijo v. Prudential Ins. Co. of America,* 72 F.3d 793, 801 (10th Cir.1995) (Jenkins, J., concurring) (citations omitted) (expressing concern that Courts have overcompensated for hostility of Courts to arbitration in decades past and commenting: "It seems to me that the rule that doubts about the scope of arbitrable issues should be resolved in favor of arbitration, like other rules of construction, should be applied only as a last resort, after the court or trier of fact has considered extrinsic evidence of the parties' intent and found it inconclusive.").

■ To determine whether a party may compel arbitration, a Court "must determine: (1) whether there is an agreement to arbitrate; (2) whether the claims fall within the scope of that agreement; and (3) whether there has been a waiver of the right to arbitrate." *Wojcik,* 901 F.Supp. at 1285, *citing Gilmer,* 500 U.S. at 24–34, 111 S.Ct. at 1651–56; *Hall v. Metlife Resources/Div. of Metropolitan Life Ins. Co.,* 1995 WL 258061, *2 (S.D.N.Y.).

The agents first argue that they signed no valid agreement to arbitrate claims against Prudential. All four agents assert that Prudential is not a party to the U–4s they signed, and Martin and Young argue that their U–4s did not bind them at the time of the events from which this litigation arises. Second, the agents argue that the arbitration provisions do not apply to the claims at issue here because (a) the arbitration clauses did not apply to employment disputes before the 1993 amendment and cannot be retroactively applied; and (b) their claims are exempt from arbitration by virtue of the insurance business exception set forth in Section 1 of the NASD Code. Finally, Martin asserts that the U–4 he signed is unenforceable as a contract of adhesion. The Court will address these arguments in turn.[10]

## I. Applicability of the U–4s to the Parties

### A. Prudential May Enforce the Arbitration Provisions Even Though it is Not Named as the "Firm" in the U–4s

■ The agents allege that Prudential is not a party to the U–4 arbitration provision and therefore cannot enforce it. That provision requires the agents "to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD]." The "firm" is identified in a separate section of each agent's U–4 as Pruco Securities Corp. ("Pruco"), Prudential's wholly-owned subsidiary. The agents claim Prudential cannot compel enforcement of an arbitration provision contained in an agreement to which it was never a party.

This argument fails for several reasons. First, the Court notes that each agent agreed to arbitrate disputes not only with his firm but with "a customer, or any other person," so long as the NASD rules require that dispute to be arbitrated. The agents have focused on the "my firm" language and failed to address the remainder of the provision. Clearly, Prudential is an "other person" whose disputes with its agents are covered by the current NASD arbitration rules. Moreover, each agent's U–4 contained a separate provision requesting names of broker-dealers other than Pruco with which he would maintain registration. With the exception of Young's 1993 U–4, each of the agents attested that they would maintain concurrent registration with Prudential.

10. The agents also argue that, even if Prudential had a right to arbitrate their claims, it waived that right when it moved to transfer the agents' cases to this Court for pretrial proceedings. Given the Court's disposition of the motion, it need not address this argument. The Court also notes that, given the extensive briefing and complexity of issues raised on these motions, this Opinion will not specifically address each point the parties raise or each case they cite. The parties should rest assured, however, that the Court has considered them.

*Prudential Ins. Co. of America v. Shammas*, 865 F.Supp. 429 (W.D.Mich.1993), is exactly on point. There, as here, the plaintiff signed a U–4 naming Pruco as "my firm" but naming Prudential as a broker-dealer with which he would maintain concurrent registration. *Id.* at 430. The Court noted that plaintiff's "act of registering with NASD was as part of his employment with Prudential" and held that "the context of his registration plus the language [providing for concurrent registration] make it clear that the representation concerning arbitration, paragraph 5 [of the U–4], applied to ... Prudential." *Id.* at 430. Within this circuit, *Foley v. Presbyterian Ministers' Fund*, 1992 WL 63269, *2 (E.D.Pa.), rejected the plaintiff's argument that his U–4 did not apply to his non-signatory employer because there was "no suggestion that plaintiff had any occasion to seek registration as a securities dealer except as an aspect of his employment with [defendant]." *See also Pitter v. Prudential Life Ins. Co. of America*, 906 F.Supp. 130, 132 n. 2 (E.D.N.Y.1995) (without discussion, requiring plaintiff to arbitrate with Prudential although Pruco was named "firm" on U–4).

*Kresock v. Bankers Trust Co.*, 21 F.3d 176, 178 (7th Cir.1994), is distinguishable. In that case, the plaintiff worked for defendant Bankers Trust, which was one of two subsidiaries of Bankers Trust New York Corporation. The other was BT Securities Corporation. BT Securities was a NASD member; Bankers Trust was not. In 1989, the plaintiff had plans to transfer from Bankers Trust to BT Securities; accordingly, she signed a U–4 which identified BT Securities as her "firm." When Bankers Trust terminated her in 1991, she had never transferred to or performed any work for BT Securities. The Court declined to enforce the U–4 arbitration provision against Bankers Trust because, as a mere co-subsidiary sharing a corporate parent with BT Securities, it was neither a NASD member, a person associated with a NASD member, a public customer or "other." *Id.* at 178. Here, by contrast, Prudential is a NASD member in its own right; its relationship to the "firm" named in the U–4s is that of parent-subsidiary; the agents' employment with Prudential was the sole reason for their signing the U–4s; and the agents specifically named Prudential as a broker-dealer with whom they would maintain concurrent registration.

## B. Martin's Employment Agreement did not Supersede his Agreement to Arbitrate

Martin alleges that in 1988, some five years after he signed his U–4 in 1983, Prudential promoted him to District Agencies Manager and entered a standard employment agreement with him which explicitly stated: "This Agreement supersedes any previous agreement the Manager may have had with the Company." (Martin Opp.Br. pp. 6–7, 10–11) Martin contends that the employment agreement supersedes his U–4 and that, since the employment agreement did not contain an arbitration clause, Prudential may not compel arbitration of his claims. (*Id.* at pp. 7, 11)

*O'Donnell v. First Investors Corp.*, 872 F.Supp. 1274 (S.D.N.Y.1995), squarely rejected a very similar argument. In that case the plaintiff had, upon acceptance of employment with the defendant, signed both a standard employment agreement and a U–4. Three years later he received a promotion and, in connection therewith, signed a new employment agreement that explicitly superseded the old. When the defendant terminated him he argued that, since he signed the U–4 as a condition to his initial employment agreement, the superseding employment agreement cancelled the U–4. The Court disagreed, holding that the U–4 "is not a contract with defendants but rather an application to qualify with various security exchanges. The U–4 is a separate contract, and as long as this contract is effective, the terms of the agreement must be followed, regardless of the fate of a separate, though related, agreement." *Id.* at 1277.

Here, too, even though Martin's employment agreement states that it "supersedes any previous agreement the Manager may have had *with the Company*" (emphasis added), the U–4 is not an agreement with Prudential and therefore remained in effect following Martin's promotion.

### C. Prudential May Enforce Young's U-4

Young argues that Prudential cannot enforce the U-4 against him because (1) he never became subject to it because he never actually engaged in the sale of securities; and (2) he was no longer subject to the first U-4 he signed once Prudential terminated him and notified the NASD of this fact, and he never became subject to the second U-4 he signed because Prudential denies that it rehired him as an agent emeritus. (Young Opp.Br. pp. 6–7)

The Court in *Foley,* 1992 WL 63269 at *1, rejected Young's first argument when it held that the "undertakings contained in Form U-4 were contingent on executing the form, not on becoming a registered dealer." *See also Cherry v. Wertheim Schroder and Co.,* 868 F.Supp. 830, 835 (D.S.C.1994) (signatory of U-4 obligated to arbitrate even though she failed to pass NASD examination); *Johnson v. Piper Jaffray, Inc.,* 530 N.W.2d 790, 798 (Minn.1995) (declining to look "beyond [plaintiff]'s job title or job description" of bond trader and determining that plaintiff was a "person associated with a member" even though she never actually traded securities).

The Ninth Circuit rejected Young's second argument in *O'Neel v. National Ass'n of Securities Dealers, Inc.,* 667 F.2d 804 (9th Cir.1982), in which the plaintiff argued that the agreement to arbitrate contained in his U-4 did not apply to a claim his former employer asserted against him nearly four years after he resigned from the NASD. The Court stated:

> It would seem strange indeed that with such a significant integrated method of dispute settlement one party could frustrate the purpose of the Exchange rules and the federal policy favoring arbitration by the mere expediency of resignation from the Exchange.

*Id.* at 806–07, *quoting Muh v. Newburger, Loeb & Co.,* 540 F.2d 970, 973 (9th Cir.1976). *Accord, 'Strappes Group, Inc. v. Siedle,* 1993 WL 443926, *5 (D.Mass.); *see also Le Roux v. Shearson Lehman Hutton, Inc.,* 160 A.D.2d 1091, 553 N.Y.S.2d 572 (3d Dept.1990) (U-4 required financial consultant to arbitrate claim against former employer where plaintiff remained a person "associated with a member" by virtue of his subsequent employment in securities industry).

## II. Applicability of Arbitration Clauses to Agents' Claims

### A. Coverage of Employment Disputes

As set forth above, the 1993 amendment added language to sections 1 and 8 of the NASD which makes it clear that the arbitration provisions currently cover employment disputes. In the legislative history to the proposal for the 1993 amendment, the NASD stated: "The NASD has taken the position that employment disputes are arbitrable under Section 8, but in order to clear up any ambiguity, it is proposing the changes ... which parallel the NYSE rule language." Fed.Reg.Vol. 58, No. 138, pp. 39070, 39071 (July 21, 1993). Prudential argues that this legislative history proves that the provisions always applied to employment disputes and that, in any event, the 1993 amendment applies to the agents' claims because they filed them after its effective date. The agents argue that the 1993 amendment indicates that the provisions did not apply to employment disputes previously and that the amendment cannot be applied retroactively.

The agents urge the Court to adopt precedent from the Seventh Circuit. In *Farrand v. Lutheran Brotherhood,* 993 F.2d 1253, 1255 (7th Cir.1993), decided before the amendment took effect, Judge Easterbrook held that "the NASD's Code does not authorize, and section 8 therefore does not require, the arbitration of an employment dispute between a member of the NASD and one of the member's registered representatives." Section 1 at that time read as follows:

> any dispute, claim, or controversy arising out of or in connection with the business of any member of the [NASD], with the exception of disputes involving the insurance business of any member which is also an insurance company:
>
> (1) between or among members;
>
> (2) between or among members and public customers, or others; ...

The Court focused on the language in section 1 following the colon, which defines the parties whose claims are subject to arbitration, and determined that members' representatives' claims are not subject to arbitration. The Court rejected the defendant's argument that the phrase "or others" in subpart (2) covered such claims, finding that "such a reading ... would make all of the words after the colon surplus." *Id.* at 1255–56. The Court acknowledged that "the NASD's rules could be stretched to cover such disputes," *id.* at 1255, and that the NASD had suggested in its proposed amendment that it "believe[d] that its Code already covers employment disputes," *id.* at 1256, but concluded that "[a] change in the Code, rather than a strained interpretation of the current language, is the right way to proceed." *Id.* at 1257.

*Kresock,* 21 F.3d at 178, which the Seventh Circuit decided after the 1993 amendment's effective date, reaffirmed *Farrand* and went on to hold that the amendment did not apply retroactively. *Id.* at 179. In *Kresock,* as here, the plaintiff had signed a U–4 that bound her to amendments of the NASD rules. But, unlike here, the plaintiff in *Kresock* had filed her claims nearly a year before the effective date of the amendment. The Court pointed out that the SEC, in its August 31, 1993 order approving the amendment, provided for the effective date of October 1, 1993, and found that this was a strong indication against retroactivity. *Id.*

The Court rejected the defendant's argument that the plaintiff's agreement to be bound by amendments to the NASD Code mandated arbitration on the ground that "[t]he incentive created by such a result would be this: after commencement of litigation, an organization such as the NASD could simply amend its rules to force one or both parties to do something (like arbitrate) that one or both never agreed to do." *Id.* Thus, the fact that the agents filed their cases after the effective date distinguishes this case from *Kresock* in a meaningful way; for a holding

that U–4 signatories are bound to amendments taking effect before they file their cases would not create this opportunity for strategic rule changes.

A recent district court opinion within the Seventh Circuit examined *Kresock* and stated that it "appeared to be primarily concerned with the application of amendments to a situation in which a claim has already been filed." *Wojcik,* 901 F.Supp. at 1287. Accordingly, the *Wojcik* Court held, the 1993 amendment applies to plaintiffs whose U–4s require them to comply with NASD rules and regulations "as amended" and who file their claims after the effective date. *Id.* at 1288.[11]

This reasoning is persuasive, and harmonizes *Kresock* with the holdings of numerous other courts which have applied the 1993 amendment to cases filed before the amendment's effective date. In *Pitter,* 906 F.Supp. at 134 (citations omitted), the Eastern District of New York held that the 1993 amendment applied to a case filed in April 1994, stating:

> The 1993 amendments to the NASD Code deal, after all, only with the forum where employment claims will be heard. They do not alter the substantive rights conferred by Congress on employees: ... In *Landgraf v. USI Film Prods.,* 511 U.S. 244, [——,] 114 S.Ct. 1483, 1502 [, 128 L.Ed.2d 229] (1994), the Supreme Court stated that 'changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity.' Thus, it is entirely appropriate to hold [plaintiff] to compliance with non-substantive rules that took effect almost six months before he filed his lawsuit.

The *Pitter* Court distinguished *Kresock* on the ground that the plaintiff there had not filed his claims until after the effective date of the amendment. *Id.* at 134 n. 5.

In *Moore,* 1995 WL 33650, the Southern District of New York rejected the plaintiff's argument that the 1993 amendment so sub-

---

11. In a later opinion in the same case, the *Wojcik* court "ma[d]e clear that [its] earlier determination that [defendant] could compel arbitration under the terms of the NASD Code was based on the facts that some of the *conduct* that is the

subject of the complaint took place after the effective date of the NASD amendment while [plaintiff] was employed with [defendant], *and* that [plaintiff] filed his complaint after that date." *Id.* at 1284 (emphasis added).

stantively changed the NASD Code that it could not be incorporated through the U-4's "as amended" clause. The Court distinguished contractual agreements to incorporate such amendments from "the very different issue of statutory retroactivity." *Id.* at *5. *See also Hall,* 1995 WL 258061 at *4, *citing Scher v. Equitable Life Assur. Soc. of the United States,* 866 F.Supp. 776, 777 (S.D.N.Y.1994) ("it is the NASD Code in existence at the time an action is commenced that governs"); *but see F.N. Wolf & Co. v. Brothers,* 161 Misc.2d 98, 102, 613 N.Y.S.2d 319, 322 (Sup.Ct.1994) (citations omitted) (without stating whether action commenced before or after effective date of amendment, holding that retroactivity "would reduce the arbitration agreement to a mere forum selection clause, overlooking the fact that by agreeing to arbitrate, parties forfeit important substantive rights to resort to a judicial forum to resolve their disputes and to appeal unfavorable results").

This Court finds the *Farrand* and *Kresock* holdings to be inapposite to this case, in which the agents all signed written agreements to abide by the rules and regulations of the NASD Code, as amended, and brought their claims after the effective date of the 1993 amendment. Given the agents' explicit agreement to arbitrate under the NASD Code "as amended," the Court must look to the rules as they existed at the time the agents filed suit, and not before. On this ground alone, it is clear that the agents may not avoid arbitration on the ground that their disputes are employment-related.

Moreover, *Farrand* and *Kresock* have been widely criticized. Most notably, the Court in *Kidd v. Equitable Life Assur. Soc. of the United States,* 32 F.3d 516, 519 (11th Cir. 1994), as well as courts in numerous cases that have followed *Kidd,* held that the NASD

Code always required arbitration of employment disputes and that the 1993 amendment was a mere clarification of that rule. The Eleventh Circuit pointed out that the *Farrand* holding creates a tension between sections 1 and 8 of the preamendment Code: whereas section 8 required the arbitration of disputes between members and "associated persons" such as employees, section 1 did not specifically authorize arbitration of disputes between members and associated persons. *Id.*[12] *Accord, F.N. Wolf & Co. v. Bowles,* 160 Misc.2d 752, 757, 610 N.Y.S.2d 757, 759 (Sup. Ct.1994) ("*Farrand*'s interpretation, based on the principle that paragraph 3 of section 1 would be rendered surplusage if arbitration of the subject dispute were required, was at the cost of making surplusage of the portion of section 8 which, in paragraph 2, mandates arbitration when demanded by an associated person against a member").

The *Kidd* Court resolved this apparent conflict by reading the language following the colon in section 1 to modify only the insurance business exception clause that immediately preceded it, rather than the entire paragraph. Under this reading, parties were required to arbitrate "any dispute connected to an NASD member's business, except for disputes involving the insurance business of an NASD member that are (1) between NASD members or (2) between NASD members and public customers or others." *Kidd,* 32 F.3d at 519. *Accord, Moore,* 1995 WL 33650 at *4.

While this Court agrees that the *Farrand* reading creates an inconsistency between sections 1 and 8 of the NASD Code, it also hesitates to adopt the *Kidd* reading of section 1. Like the Court in *Pitter,* 906 F.Supp. at 135, this Court "has difficulty understanding what interest the NASD would have in qualifying the insurance business exception

---

12. The *Kidd* Court also found, 32 F.3d at 519–20, that the *Farrand* holding created tension between the NASD Code and the U-4 itself, pursuant to which signatories agreed to arbitrate any dispute, claim or controversy that may arise *"between me and my firm* ... that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register."* (emphasis supplied). The Court noted that its holding would avoid "the strange situation wherein Appellees signed U-4 forms promising

to arbitrate any disputes with their employer required to be arbitrated by the NASD at a time when the NASD rules did not mandate arbitrate of employer-employee disputes." *Id.* The Court finds this reasoning unconvincing. The U-4 is a universal form, to be used for registration with a multitude of different bodies. Some of these, including the New York Stock Exchange, unequivocally required arbitration of employment disputes at the time the agents signed their U-4s.

clause with the enumerated categories that follow." The Courts in *'Strappes,* 1993 WL 443926 at *4, and *Johnson,* 530 N.W.2d at 797, resolved the conflict by reading the phrase "or others" in section 1 to incorporate all the categories specifically identified in section 8, including "persons associated with members." This reading solves the problem with the "or others" language which the *Farrand* Court highlighted without requiring the somewhat strained interpretation of section 1 that *Kidd* advanced. While the Court need not specifically adopt any interpretation of sections 1 and 8 in light of its holding that the 1993 amendment applies to the agents' claims, it will note that the *'Strappes/Johnson* reading appears to be the most logical.

Yet another approach courts have taken to this semantic conundrum is to label it an ambiguity and apply the presumption in favor of arbitration to resolve the issue. As noted in *Kidd,* 32 F.3d at 519 n. 6, the *Farrand* Court "acknowledged that it was not unreasonable to interpret the pre-amendment Code to require arbitration of employment disputes." Thus, the *Kidd* Court found, *Farrand's* adoption of an alternative construction contravened well-established federal precedent that doubts regarding the scope of arbitrable issues are to be resolved in favor of arbitration. *Id., citing Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), *Wick v. Atlantic Marine, Inc.,* 605 F.2d 166 (5th Cir.1979). *See also Armijo,* 72 F.3d at 798 ("to acknowledge the ambiguity is to resolve the issue, because all ambiguities must be resolved in favor of arbitrability"); *O'Donnell,* 872 F.Supp. at 1278 (rejecting *Farrand* and finding that *Kidd* "makes more sense given the liberal federal policy toward arbitration"); *Pitter,* 906 F.Supp. at 136; *Bowles,* 160 Misc.2d at 757, 610 N.Y.S.2d at 759–60.

This Court is not convinced that the presumption in favor of arbitrability would be powerful enough on its own to compel arbitration where the language of the provisions is so unclear. However, the *Kidd* opinion provided additional support for its holding that the preamendment Code contemplated arbitration of employment disputes, 32 F.3d

at 520, to wit, (1) dicta from a District of Columbia Circuit case stating that "NASD rules mandate arbitration of employer-employee disputes, and did so, to the same extent as they do now, before the development of [the U–4]." *Association of Inv. Brokers v. Securities and Exchange Com'n,* 676 F.2d 857, 861 (D.C.Cir.1982) (Ginsburg, J.); (2) a 1987 NASD statement that employment disputes between members and their registered agents were arbitrable, 52 Fed.Reg. 9232 (1987); and (3) the NASD's statement that the purpose of its amendment was to clarify that employment disputes are arbitrable, 58 Fed.Reg. 45,932 (1993). As pointed out in *Pitter,* 906 F.Supp. at 137 (citing cases), agencies and exchanges have substantial authority to interpret their own rules and regulations. *See also Bowles,* 160 Misc.2d at 758, 610 N.Y.S.2d at 760 (citations omitted) (applying principle that courts should defer to administrative agency's interpretation of its own regulations unless "irrational or unreasonable" to NASD).

This position finds further support in numerous opinions that predate the 1993 amendment in which courts applied the NASD arbitration clause to employment disputes of various kinds. *See e.g., Association of Inv. Brokers,* 676 F.2d at 861; *Bender v. Smith Barney, Harris Upham & Co.,* 789 F.Supp. 155 (D.N.J.1992); *Spellman v. Securities, Annuities and Ins. Servs., Inc.,* 8 Cal. App.4th 452, 464, 10 Cal.Rptr.2d 427, 435 (Cal.App. 2 Dist.1992).

In sum, the Court finds ample indications that the preamendment NASD Code applied to employment disputes such as the agents' claims; however, the Court will simply hold that, since all the agents filed their claims after the effective date of the amendment, they are bound thereby and may not avoid the arbitration provisions simply because their disputes are employment-related. This does not end our analysis, however. The fact that the agents have asserted claims that are arbitrable under the terms of their U–4 does not mean that they must arbitrate them against Prudential. As an insurance company, Prudential is potentially subject to the "business of insurance" exception set forth in the NASD Code.

## B. The Insurance Business Exception

Section 1 of the NASD Code excludes from its list of matters eligible for arbitration all "disputes involving the insurance business of any member which is also an insurance company." Although none of the parties were able to enlighten the Court as to the drafting history or reasoning behind this exception, presumably it has something to do with the lack of insurance industry expertise on the part of securities industry arbitrators. Certainly, it would stand to reason that the drafters of the NASD might have recognized that a category of its signatories belong to an industry which, although it sells some products with a securities component, operates otherwise in a separate sphere from the rest of the securities industry. Especially given the complex regulatory framework which governs the insurance industry, the exception makes a great deal of sense.

Numerous cases have found the insurance business exception inapplicable to personnel and various other employment related disputes. *See, e.g., Shammas,* 865 F.Supp. at 432 (plaintiff claimed national origin, race, religion and sex discrimination, plus retaliation for complaining about alleged discrimination); *Foley,* 1992 WL 63269 at *2 (plaintiff alleged his termination was unlawful under ADEA, ERISA and unspecified state law); *Wojcik,* 901 F.Supp. 1282 (plaintiff claimed defendants took various unlawful actions against him in retaliation for refusal to accept job change). Requiring arbitration of garden-variety employment disputes involving U–4 signatories makes sense because, as Prudential's counsel pointed out at oral argument, securities arbitrators have a wealth of experience resolving such disputes; accordingly, these courts properly declined to apply the exception.

From this authority, however, Prudential asks the Court to derive a rule that the insurance business exception can never apply where the plaintiff alleges an employment-related injury. A contrary rule, asserts Prudential, would allow any employee of an insurance company to avoid arbitration "simply by alleging the dispute involves consideration of the company's insurance business." (Prudential Reply Br. p. 16) Prudential's argument focuses too narrowly upon the injuries the agents allege, disregarding the scope and nature of the issues the trier of fact will have to analyze in determining whether or not to grant relief for those injuries.

The agents concede that garden-variety employment disputes do not implicate the insurance business exception. They claim, however, that the instant case is distinguishable from ordinary employment disputes on the ground that their claims are more intricately connected with the allegedly fraudulent and illegal character of Prudential's insurance business practices than are claims in ordinary employment disputes. This Court agrees—and would add that this case is also distinguishable from garden variety employment disputes in another important respect. The agents' claims are intertwined with dozens of putative class actions potentially involving hundreds of thousands of policyholders who have made allegations against Prudential that involve the same factual issues that the agents' claims raise. The resulting potential for inconsistent results and inefficiencies provided the impetus for the consolidation of all of these actions in this Court, and the same circumstances—while they obviously could not justify a reformation of a binding contract to arbitration claims—have also weighed into the Court's determination that these claims involve Prudential's insurance business and therefore belong in this Court and not in a separate arbitral forum. The Court does not share Prudential's concern that future disgruntled insurance employees will avoid arbitration simply by including allegations involving their employers' insurance business; courts are perfectly capable of looking beyond the face of a complaint to determine whether or not the dispute really involves a defendant's insurance business.

The Court is aware that the few courts which have addressed the application of the insurance business exception to claims arising out of employment relationships appear to have rejected the agents' position; however, the Court finds each of these cases distinguishable under the unique circumstances of

the instant case. To the extent they are not, the Court declines to follow them here. In *Young v. Prudential Ins.*, Docket No. SOM–L–907–95 at p. 4 (slip op.) (N.J.Super. Law Div. Oct. 19, 1995), the Court refused to apply the exception to a claim for discharge in retaliation for whistle blowing, finding that "the exception relating to insurance and the business of insurance ... must of necessity relate to disputes about the practices of an insurance company raised between insurance companies themselves and not to the alleged retaliation visited on an employee who calls attention to his insurance company employer's alleged unlawful insurance practice."

The opinion provides few specifics about the retaliatory discharge claim—only that it involved the plaintiff's "whistleblowing about unlawful conduct of other Prudential employees." *Id.* at 2. Thus, it is not clear that the claim would have required the Court to engage in the comprehensive evaluation of Prudential's insurance practices that the agents' claims might require. Moreover, this Court finds no support in the text or history of the NASD Code for the *Young* Court's finding that the exception applies only to disputes between insurance companies themselves. Accordingly, the Court will decline to follow *Young* in this matter.

In *Trumbetta v. Metropolitan Life Ins. Co.*, 1994 WL 481152, *3 n. 3 (E.D.Pa.), the Court refused to apply the exception where, although

> the plaintiff ma[de] some general allegations in the complaint that [defendant] is engaging in unlawful insurance practices, the basis of his claims stem from actions taken by the defendants against the plaintiff since he did not participate in their alleged scheme. Thus, whether or not the defendants actually engaged in any unlawful insurance practice is irrelevant to this dispute.

The *Trumbetta* opinion does not set forth the factual details of the plaintiff's claims in that case; however, the case appears to be distinguishable from the agents' claims here. In *Trumbetta*, the plaintiff had made "some general allegations in the complaint" that the defendant insurance company had engaged in "certain unlawful insurance practices" and

that the defendants had taken adverse actions against him "since he did not participate in their alleged scheme." *Id.* at *3. However, the "thrust" of the *Trumbetta* complaint was "that the defendants harassed and persecuted [plaintiff] such that he lost business and th[u]s ultimately was constructively discharged." *Id.*

Accordingly, the *Trumbetta* Court found that "whether or not the defendants actually engaged in any unlawful insurance practices is irrelevant to this dispute." *Id.* Although it is not entirely clear from the opinion, it would seem that the plaintiff in *Trumbetta* could prove that illegal acts of harassment and persecution led to his constructive discharge without proving that defendants actually engaged in unlawful insurance practices; thus, the *Trumbetta* case implicated the business of insurance only indirectly, having to do only with the defendants' motivation for what would be, if proven, independently unlawful acts.

Here, by contrast, Prudential discharged the agents in what would facially appear to be an entirely proper manner. Prudential's action becomes unlawful only if the agents can prove that it was taken in retaliation for the agents' refusal to cooperate with unlawful insurance practices, and only if the practices the agents refused to participate in were actually fraudulent or unlawful does Prudential's allegedly retaliatory motive become improper or unlawful.

*Armijo*, 72 F.3d 793, is also distinguishable from this case. In *Armijo*, the plaintiffs framed their claim as an ordinary Title VII claim for discrimination based upon national origin. *Id.* at 800 (emphasis added) ("the dispute *as framed by the Plaintiffs* is predicated on the civil-rights laws, not the insurance laws, and they are predicated on [defendant]'s role as an employer rather than as an insurer"). The only basis for applicability of the insurance business exception was the defendant's defense of the adverse employment actions it had taken against plaintiffs on the ground that plaintiffs had violated the insurance laws. Here, by contrast, plaintiffs' allegations of insurance business misconduct form the very center of their claims. Indeed, without the agents' allegations that

Prudential engaged in improper insurance business practices, there would be no lawsuit. Plainly, such claims "involv[e] the insurance business of [a] member which is also an insurance company," and the NASD will not require a securities industry arbitrator to resolve it.

### III. Enforceability of Martin's U-4

■ Martin argues that "the alleged arbitration agreement is one of adhesion, was entered into fraudulently and does not bind Martin in any manner." (Martin Br. p. 3) He asserts that his agreement to submit to the jurisdiction of the organizations for which he applied for registration was "buried" at the end of one of many purported "employment forms" which Prudential presented for his immediate signature as a condition of employment. Martin acknowledges his express agreement, appearing in "fine print" (Martin Br. p. 6) at paragraph 5 of the U-4, "to arbitrate any dispute . . . that is required to be arbitrated" under NASD rules. However, he claims that neither of these provisions should bind him to arbitrate this dispute because, contrary to Prudential's own representation at the end of the U-4 that "the applicant will be familiar with the . . . rules and by-laws of the . . . self-regulatory organization with which this application is being filed, and the rules governing registered persons," Martin was never provided with copies of any of the rules or regulations with which he purportedly agreed to comply. (Martin Br. p. 5)

A somewhat similar argument has prevailed in the Ninth Circuit. In *Prudential Ins. Co. of America v. Lai*, 42 F.3d 1299, 1301 (9th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995), as here, the plaintiffs alleged that

> when they signed the U-4 form, they were told only that they were applying to take a test, which was required for their employment by Prudential, and that they were simply directed to sign in the relevant place without being given an opportunity to read the forms. Arbitration was never mentioned, and plaintiffs were never given a copy of the NASD Manual.

The Court held that, under these circumstances, the plaintiffs had not knowingly agreed to waive their rights to sue in federal court under Title VII; it based its holding, however, on specific language from the federal statute requiring a knowing agreement to waive such rights before a plaintiff can be compelled to arbitrate. *Id.* at 1304–05. The agents have pointed to no such statutory requirement of a knowing waiver of their rights; accordingly *Lai* is distinguishable from this case.

Moreover, *Lai* has been rather extensively criticized. *See Beauchamp v. Great West Life Assur. Co.*, 918 F.Supp. 1091, 1096 (E.D.Mich.) (holding that *Lai* misreads Title VII and "flies in the face of" *Gilmer* and basic contract law); *Maye v. Smith Barney, Inc.*, 897 F.Supp. 100, 107 (S.D.N.Y.1995) (citing cases); *Degaetano v. Smith Barney, Inc.*, 1996 WL 44226, *7 (S.D.N.Y.) (citing cases). And numerous other courts have rejected similar arguments. In *Bender*, 789 F.Supp. at 159, the Court found that the plaintiff failed to allege that defendant Smith Barney made a false or misleading statement "either as to the Form U-4 itself or as to any inducement to sign the form . . . [and] failed to present any legal support establishing that [her employer] had a duty to disclose or to explain the existence or scope of the Form U-4 arbitration clause." The *Bender* Court found that, since brokers have no legal duty to disclose or explain arbitration clauses to their customers, their duty to employees such as the plaintiff is "even less." *Id.* Finally, the *Bender* Court held, 789 F.Supp. at 159,

> [E]ven if Smith Barney had explained the scope of the arbitration clause to plaintiff, the end result would have been the same; the execution of a Form U-4 is not unique to Smith Barney employees and it is not optional. It is an SEC industry-wide requirement, a prerequisite to registration with any securities firm. Thus, plaintiff could not have been fraudulently induced into signing this document or could not have detrimentally relied on any affirmative representations rendered by Smith Barney. . . . Smith Barney is bound by the terms of the Form U-4 to the same extent as plaintiff is bound.

*See also Pitter*, 906 F.Supp. at 140 (rejecting *Lai* and noting: "the fact that a U–4 form does not specifically identify employment claims—or any other types of claims—as among those to be arbitrated does not mean that a registrant has failed knowingly to enter into an arbitration agreement. Indeed, the lack of specificity only highlights the breadth of the agreement."); *Cherry*, 868 F.Supp. at 836 (absent "any allegation of fraud, coercion, or unfairness" Court rejects plaintiff's argument that unequal bargaining power voided the agreement); *Beauchamp*, 918 F.Supp. at 1098.

This Court is sympathetic to the views of those who believe that the arbitration provisions to which employees in the securities industry are required to submit as a condition of their employment are unfair. However, basic contract law and longstanding judicial precedent clearly preclude a holding that Martin's U–4 is a contract of adhesion.

The Court is intrigued, however, by Martin's argument that Prudential's failure to provide him with copies of the rules and regulations with which the U–4 obligated him to comply *despite its explicit written attestation that it had done so* precludes the company from demanding arbitration. This is a question which the courts do not appear to have addressed yet. The parties have not fully briefed the issue, and in light of the Court's holding on the insurance business exception it is unnecessary for this Court to explore it further; however, the Court highlights this as a potential ground for exploration.

## PRUDENTIAL'S MOTION TO DISMISS ON SECTION 301 PREEMPTION GROUNDS

 As set forth above, Gordon, Weaver and Schulte were union members during their employment with Prudential and, accordingly, governed by the terms of the CBA. Under Labor Management Relations Act ("LMRA") § 301,

Suits for violation of contracts between an employer and a labor organization repre-

senting employees in an industry affecting commerce as defined in this Act, or between any labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). While the statute on its face simply provides for federal jurisdiction over controversies involving collective bargaining agreements, the preemptive force of section 301 has long been acknowledged. *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 403–06, 108 S.Ct. 1877, 1880–82, 100 L.Ed.2d 410 (1988); *Berda v. CBS Inc.*, 881 F.2d 20, 22 (3d Cir.1989), *cert. denied, CBS, Inc. v. Berda,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990). Essentially, the preemption doctrine that has developed provides that:

if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are states) is preempted and federal labor-law principles—necessarily uniform throughout the Nation—must be employed to resolve the dispute.

*Lingle*, 486 U.S. at 405–06, 108 S.Ct. at 1881. The "limited purpose" of the doctrine is to ensure "that a uniform law is applied in interpreting collective bargaining agreements," *Berda v. CBS Inc.*, 881 F.2d 20, 27 (3d Cir.1989), and to enforce arbitration provisions in such agreements. *Livadas v. Bradshaw,* —— U.S. ——, ——, 114 S.Ct. 2068, 2077, 129 L.Ed.2d 93 (1994).

[13–15] Thus, the proper approach to a state law preemption question is to analyze each element of the state claim at issue and then to determine whether its resolution will require the Court to construe or interpret any terms or provisions of the applicable labor agreement. *See Lingle*, 486 U.S. at 407, 108 S.Ct. at 1882.[13] The fact that a

---

13. The Sixth Circuit has outlined a two-part test for determining preemption questions, asking first "whether proof of the state law claim requires interpretation of collective bargaining agreement terms" and second "whether the right claimed by the plaintiff is created by the collec-

labor agreement provides a remedy that the plaintiff could pursue as an alternative to state law claims does not mandate preemption. *See Trans Penn Wax Corp. v. McCandless,* 50 F.3d 217, 229 (3d Cir.1995) ("plaintiff may bring a state law tort action against an employer, even where he could have brought a similar claim based on a provision in his collective bargaining agreement, so long as the state claim does not require interpretation of the collective bargaining agreement"). At the same time, however,

> the fact that a particular provision of the [CBA] may not explicitly address the conduct underlying [the] complaint does not mean that resolution ... does not require interpretation of the agreement.... The governmental nature of the collective-bargaining process demands a common law of the shop which implements and furnishes the context of the agreement although not expressed in it.

*Douglas v. American Information Technologies Corp.,* 877 F.2d 565, 572 (7th Cir.1989).

That resolution of a state law claim might require *consultation* of a collective bargaining agreement does not mandate preemption; a claim is preempted only if its resolution requires *interpretation or construction* of a collective bargaining agreement. *See Hawaiian Airlines, Inc. v. Norris,* —— U.S. ——, —— n. 8, 114 S.Ct. 2239, 2248 n. 8, 129 L.Ed.2d 203 (1994) (citations omitted); *Livadas v. Bradshaw,* —— U.S. ——, ——, 114 S.Ct. 2068, 2078, 129 L.Ed.2d 93 (1994) (citations omitted) ("when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished"); *Thomas v. LTV Corp.,* 39 F.3d 611, 620 (5th Cir.1994); *Pelech v. Klaff-Joss, LP,* 828 F.Supp. 525, 531 (N.D.Ill.1993) (citations omitted) (section 301 did not preempt claim where complaint frequently referred to but

did not require interpretation of collective bargaining agreement terms).

The circuit courts have not yet reached a consensus on whether reliance upon terms of a collective bargaining agreement as a defense to plaintiff's claims creates grounds for preemption. *See Livadas,* —— U.S. at —— n. 18, 114 S.Ct. at 2078 n. 18 (noting disagreement among courts); *Schacht v. Caterpillar, Inc.,* 503 U.S. 926, 926–27, 112 S.Ct. 1306, 1306–07, 117 L.Ed.2d 527 (1992) (White, J., dissenting) (same). Although a majority of federal circuit courts who have addressed the issue have held that a court should consider potential defenses in the section 301 preemption analysis, this Court finds that the question remains unresolved in the Third Circuit.

In *Capraro v. United Parcel Service Co.,* 993 F.2d 328, 332 (3d Cir.1993), the Court held that where either the plaintiff's claim or the defendant's defense relies on interpretation of a collective bargaining agreement, the Railway Labor Act ("RLA") preempts the claim. As the preemption standard under the RLA is "virtually identical" to that under the LMRA, *Hawaiian Airlines,* —— U.S. at ——, 114 S.Ct. at 2247, *Capraro* provides a strong indication that the Third Circuit would consider issues raised in defense of state claims to be relevant to the preemption analysis.

However, in an earlier case arising directly under the LMRA, the Third Circuit arrived at a different conclusion. *Berda v. CBS, Inc.,* 881 F.2d 20 (3d Cir.1989). Relying on *Caterpillar Inc. v. Williams,* 482 U.S. 386, 398–99, 107 S.Ct. 2425, 2433, 96 L.Ed.2d 318 (1987), the *Berda* Court held that "the fact that as part of a defense to a state law contract claim an employer might raise 'a federal question, even a § 301 question,' does not mean that the claim is preempted. The preemption of state law engendered by section 301 is only occasioned when the claim raised 'on the face of the complaint' substantially depends on interpretation of a collective bargaining agreement for its resolution."

---

tive bargaining agreement or by state law." *De-Coe v. General Motors Corp.,* 32 F.3d 212, 216 (6th Cir.1994). Preemption is warranted under the Sixth Circuit test unless the claim (1) does not require contract interpretation *and* (2) does

assert a right borne under state law. *Id.* Because this Court finds no support in the *Lingle* holding for the second portion of the Sixth Circuit test, and because no party has argued for its application to this case, we decline to adopt it.

*Berda,* 881 F.2d at 23–24, *quoting Caterpillar,* 482 U.S. at 398–99, 107 S.Ct. at 2433.

*Berda* should be viewed through the prism of the Supreme Court authority upon which it relies. *Caterpillar* was not a true section 301 preemption case; rather, the issue presented in that case was whether the doctrine of *complete preemption* applied to allow the defendants in the case to remove to federal court claims brought exclusively under state law.[14] Indeed, the *Caterpillar* Court specifically noted: "We intimate no view on the merits of … any of the [section 301] preemption arguments discussed above." *Caterpillar,* 482 U.S. at 398 n. 13, 107 S.Ct. at 2433 n. 13. It also stated: "It is true that when a defense to a state claim is based on the terms of a collective-bargaining agreement, the state court will have to interpret that agreement to decide whether the state claim survives." *Id. See also Smith v. Colgate–Palmolive Co.,* 943 F.2d 764, 770 (7th Cir.1991) (interpreting *Caterpillar* to hold that claims might ultimately be preempted based on issues raised by defense). In light of this dicta in the Supreme Court case upon which *Berda* relies, as well as the Third Circuit's subsequent opinion in *Capraro,* this Court finds that Third Circuit precedent does not preclude an examination of potential defenses in the determination of whether section 301 preemption applies.

The Seventh, Eighth and Ninth Circuits have clearly stated that defenses are relevant in the preemption analysis.[15] As noted above, the Seventh Circuit cited *Caterpillar* to support its determination that it was "free to resolve this [preemption] question by looking beyond the plaintiffs' complaint to the defenses [defendant] asserts." *Smith,* 943 F.2d at 770. *See also Loewen Group Int'l, Inc. v. Haberichter,* 65 F.3d 1417, 1423 (7th Cir.1995).

Both the Ninth Circuit and the Eighth Circuit have cited *Lingle,* 486 U.S. at 407, 108 S.Ct. at 1882, in determining that potential defenses are relevant to the preemption analysis. *Jimeno v. Mobil Oil Corp.,* 66 F.3d 1514, 1524 (9th Cir.1995); *Hanks v. General Motors Corp.,* 859 F.2d 67, 70 (8th Cir.1988). Each of these cases refers to the same passage from the *Lingle* opinion, where, in determining that the retaliatory discharge claims at issue did not require interpretation of the collective bargaining agreement, the *Lingle* Court first noted that none of the elements of the tort required such an interpretation and then stated:

> To defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge; this purely factual inquiry likewise does not turn on the meaning of any provision of a collective-bargaining agreement. Thus, the state-law remedy in this case is 'independent' of the collective-bargaining agreement …: resolution of the state-law claim does not require construing the collective-bargaining agreement.

This clear indication that potential defenses are relevant to a section 301 preemption

---

**14.** The *Caterpillar* Court described the complete preemption doctrine as follows: "On occasion, the court has concluded that the pre-emptive force of a statute is so 'extraordinary' that it 'converts and ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.' " 482 U.S. at 392, 107 S.Ct. at 2430, *quoting Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 65, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987). It held that consideration under the complete preemption doctrine of issues raised in an affirmative defense would be inappropriate because of the strictures against such consideration contained in the well-pleaded complaint rule. *Id.,* 482 U.S. at 398–99, 107 S.Ct. at 2433.

**15.** The Sixth Circuit has taken the contrary position. In *DeCoe v. General Motors Corp.,* 32 F.3d

212, 216 (6th Cir.1994), the Court held the preemption inquiry should focus on "the essence of the plaintiff's claim…. If the plaintiff can prove all of the elements of his claim without the necessity of contract interpretation, then his claim is independent of the labor agreement." Thus, the Court held, a defendant's assertion of the contract as an affirmative defense cannot "turn an otherwise independent claim into a claim dependent on the labor contract." *Id.* (citation omitted). *See also O'Shea v. Detroit News,* 887 F.2d 683, 687 (6th Cir.1989) ("All the plaintiff has to allege is that an action was taken against him because of a motive impermissible under [state law]. It is irrelevant to the preemption question whether or not the employer can defend by showing it had the right under the collective bargaining agreement to do what it did.")

analysis, coming one year after the *Caterpillar* decision, provides a further indication that the Supreme Court did not intend that its *Caterpillar* holding should apply beyond the context of the complete preemption doctrine.

These decisions comport with the policies and purposes of section 301 preemption. As set forth above, *supra* pp. 643–44, the reason courts have ascribed such broad preemptive effect to section 301 is to enforce properly negotiated arbitration provisions and to ensure uniformity of interpretation regarding collective bargaining agreements. A court can frustrate this policy just as effectively by deciding an issue that arises in a defense as it can by deciding that same issue when it arises as an element of the plaintiff's proof. Accordingly, this Court will consider not only the issues raised by the agents' claims but also the issues raised by Prudential's defenses in determining whether section 301 preemption applies.

Prudential moves to preempt two categories of claims: (1) those of Gordon, Weaver and Schulte for retaliatory discharge; and (2) Weaver's claims for defamation and tortious interference with business expectancies.[16] Prudential contends these claims will require the Court either to interpret specific provisions of the CBA or to examine relationships and practices governed by the CBA. For example, the company claims it terminated Schulte and Weaver for low sales production under the terms of its low production probation policy ("LPP policy"). Prudential asserts that the CBA supplied the authority under which it adopted the LPP policy, and that the CBA mandates grievance arbitration for disputes arising out of its application of the policy.

Similarly, Prudential states that it terminated Gordon when he failed to return to work after his disability period expired. Under the company's Service Disability Allowance Plan (the "disability plan"), expressly incorporated into the CBA in effect at the time, agents with less than five years' service are entitled to six months of disability leave benefits but face termination if they do not return to work at the end of the six-month

period. Finally, Prudential defends Weaver's charges of defamation and tortious interference with business relations on the grounds that it owed its policyholders an obligation to disclose the information it imparted and that Weaver had no reasonable expectation of maintaining an independent business relationship with Prudential policyholders. Prudential contends that these relationships between the company, its agents and its policyholders are all governed by express and implied terms of the CBA.

### I. Retaliatory Discharge

 Under Illinois law, which applies to the claims of Weaver and Schulte, a retaliatory discharge complaint must allege (1) that the employer discharged the employee in retaliation for the employee's activities; and (2) that the discharge contravened a "clearly mandated public policy." *Carter Coal Co. v. Human Rights Com'n*, 261 Ill. App.3d 1, 9, 198 Ill.Dec. 740, 746, 633 N.E.2d 202, 208 (App.1994), *citing Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981). Under Kentucky law, upon which Gordon's claim is based, the tort of retaliatory discharge is similarly limited to "those situations where the evidence establishe[s] the employer was retaliating against the employee for exercising a right conferred by well-established legislative enactment or for refusing to violate the constitution or a statute." *Nelson Steel Corp. v. McDaniel*, 898 S.W.2d 66, 69 (Ky. 1995). According to Prudential, "[t]he central issue in a retaliatory discharge claim is whether the employer had an illicit motive in terminating the employee; an evaluation of the employer's stated reasons for termination is inseparable from this determination." (Prudential Br. p. 17)

 In *Lingle, supra,* the Supreme Court determined that section 301 did not preempt an Illinois state law claim that alleged retaliatory discharge for filing a workers compensation claim. The defendant in that case claimed that the reason for the discharge was that the plaintiff's workers compensation claim contained false informa-

---

**16.** Schulte concedes that his Illinois and federal age discrimination claims are preempted.

tion, and that this constituted "just cause" for termination under the parties' collective bargaining agreement. The Supreme Court found that the state law claim was independent of the collective bargaining agreement because it turned on questions pertaining to "the conduct of the employee and the conduct and motivation of the employer," the determination of which did not require the Court to interpret any terms of the agreement. *Id.*, 486 U.S. at 407, 108 S.Ct. at 1882. *See also T.J. Gendron v. Chicago and North Western Transp. Co.*, 139 Ill.2d 422, 435, 151 Ill.Dec. 545, 551, 564 N.E.2d 1207, 1213 (1990) (citation omitted).

Prudential attempts to distinguish *Lingle.* It points out that it took adverse employment actions against Weaver, Schulte and Gordon under terms of the CBA that were much more specific than the "just cause" provision at issue in *Lingle,* and contends that, whereas the *Lingle* defendants simply referred to the "just cause" provision as a justification for terminating the plaintiff there, this Court must actually examine and interpret CBA terms to resolve the agents' retaliatory discharge claims.

Specifically, Prudential claims the Court will have to "evaluate" Prudential's claim that it terminated Weaver and Schulte for low sales production pursuant to the LPP policy—which, in turn, will require the Court to examine the amount of commissions these agents earned during the relevant period and to compare their performance to that of similarly situated agents who were not terminated. To decide Gordon's retaliatory discharge claim, Prudential argues, the Court will have to resolve a disagreement between Prudential and Gordon as to whether or not Prudential's disability plan authorized it to terminate Gordon. (Prudential Br. p. 20)

There are several potential problems with Prudential's arguments. First, it is far from clear that resolution of the retaliatory discharge claims will ultimately turn on the application of any specific CBA terms. It does not appear that either Illinois or Kentucky requires a retaliatory discharge plain-

tiff to show that the employer's *sole* motivation for taking action against the plaintiff was retaliatory. *See Szaflarski v. Lurie Co.*, 1991 WL 169356, * 6 (N.D.Ill.); *First Property Mgt. Corp. v. Zarebidaki,* 867 S.W.2d 185, 188 (Ky.1993); *Willoughby v. GenCorp, Inc.*, 809 S.W.2d 858, 861 (Ky.App.1990). Accordingly, if the agents can trace Prudential's actions against them even partially to improper retaliatory motives, the Court may be able to resolve the issue in their favor without even consulting the CBA. *See Thomas*, 39 F.3d at 621.

Although Prudential contends that its defenses bring the CBA into play, this is not so apparent either. A court in this district recently declined to preempt a retaliatory discharge claim, holding: "Even if the employer's nonretaliatory explanation for the discharge depends on its interpretation of the collective bargaining agreement, '[s]o long as this interpretation was made in good faith and actually motivated ... the [employer's] actions,' it constitutes a valid defense 'without regard to the correctness of the interpretation.'" *Kube v. New Penn Motor Express, Inc.*, 865 F.Supp. 221, 231 (D.N.J.1994).[17] And, as an Illinois district court recently pointed out, courts in the Seventh Circuit have "consistently held that § 301 does not preempt retaliatory discharge cases" because "courts need not venture beyond a determination of whether an employer's termination decision was motivated by the employee's filing of a claim or other method of opposition." *Pelech*, 828 F.Supp. at 531 n. 7.

Prudential's position also assumes that the agents *challenge* its interpretation of the CBA. Clearly, if the parties all agree on the meaning of the relevant CBA provisions, the doctrine of preemption does not preclude the Court from deciding whether or not they constitute valid defenses. *Hawaiian Airlines, Inc.*, —— U.S. at ——, 114 S.Ct. at 2248 n. 8; *Livadas*, —— U.S. at ——, 114 S.Ct. at 2078. The agents apparently do not challenge Prudential's authority under the CBA to adopt or implement the LPP policy, nor do

---

**17.** Although the *Kube* plaintiff's claims arose under New Jersey law, the Court specifically found that the elements for a retaliatory discharge claim in New Jersey "closely mirror" those in Illinois. *Kube*, 865 F.Supp. at 230–31.

they assert that Prudential has violated the terms of the CBA, the LPP policy or any other internal rule, procedure or practice adopted thereunder.[18] (See Weaver/Schulte Opp. Br. p. 11)

Even to the extent that the agents attack the LPP policy directly for requiring production levels that can only be met through illegal sales practices, their claims do not appear to present an interpretation question. See Sayres v. Lancaster Press, Inc., 1994 WL 71277 (E.D.Pa.) (no preemption where plaintiff and defendant agreed on intent and meaning of provision in collective bargaining agreement but disagreed as to whether provision violated state law).

Douglas, 877 F.2d at 565, is distinguishable. There, plaintiff sued her employer for intentional infliction of emotional distress, alleging that the defendant had harassed her by arbitrarily denying ordinary employees' rights such as vacation and sick time and by unduly scrutinizing her work. Id. at 567–68. The Court found that "even though the complaint facially stated a state-law tort claim, [plaintiff] was actually seeking relief for alleged breaches of the collective bargaining agreement." Id. at 568. Here, by contrast, Weaver and Schulte have asserted claims that the Court will likely decide without substantial reference to, much less interpretation of, the CBA.

Arguments like Prudential's have fared poorly in other courts as well—including the United States Supreme Court. In Hawaiian Airlines, ——— U.S. at ———, 114 S.Ct. at 2251,[19] an employee claimed his employer discharged him after he refused to sign maintenance records because he believed the maintenance had not been performed properly. The employer argued that the claim should be preempted because it would require the Court to interpret a collective bargaining agreement provision setting forth circumstances under which employees were required to sign maintenance records. The Court found that "[a]lthough such a determination would be required with regard to [the employee's] separate allegation of discharge in violation of the agreement . . . [t]he state tort claims, by contrast, require only the purely factual inquiry into any retaliatory motive of the employer."[20]

Prudential cites Doran v. Thermatex Corp., 1989 WL 163700 (N.D.Ohio), Thomas, 39 F.3d 611, and Riccio, 1992 WL 281159, cases in which courts have preempted retaliatory discharge claims. All are distinguishable. In Doran, the plaintiff's claims were preempted only because he himself raised an issue requiring interpretation of the collective bargaining agreement. See Kube, 865 F.Supp. at 230 (noting that Doran Court preempted claim "because it was based on the allegation that the employer had incorrectly interpreted the collective bargaining agreement.") Similarly, the Court in Thomas, 39 F.3d at 620, explicitly based its preemption holding on the fact that the plaintiff himself had grounded his claim on an inter-

18. Although the Court need not examine the question in detail, we reject the argument, which Schulte and Weaver advance, that the LPP policy is not a collectively bargained agreement and as such cannot provide a basis for § 301 preemption. See Riccio v. Prudential Ins. Co. of America, 1992 WL 281159, * 2 (D.N.J.) (where plaintiff's claim relied on agency agreement which was in turn subject to CBA, agency agreement was "within the purview of section 301"); Thomas, 39 F.3d at 617–18.

19. As noted supra p. 644, Hawaiian Airlines arose under the RLA rather than the LMRA, but the Supreme Court noted that the standards for preemption under the two statutes are "virtually identical." Id., ——— U.S. at ———, 114 S.Ct. at 2247.

20. Prudential overestimates the scope of the preemption doctrine when it argues that the Court should preempt Weaver's and Schulte's claims in order to forestall the possibility that a judgment for plaintiffs would nullify Prudential's "management right" under the CBA to establish and modify its LPP policy. (Prudential Br. p. 19) The Supreme Court rejected such an argument in Hawaiian Airlines, ——— U.S. at ———, 114 S.Ct. at 2246, when it refused to preempt a discharged airline mechanic's state court action, stating: "Wholly apart from any provision of the CBA, petitioners had a state-law obligation not to fire respondent in violation of public policy or in retaliation for whistleblowing." See also Miller v. AT & T Network Sys., 850 F.2d 543, 546 (9th Cir.1988) (state law rights existing independent of labor contract rights are not preempted because a "contrary rule would permit unions and employers to exempt themselves from state labor standards"); Thomas, 39 F.3d at 620.

pretation of the relevant labor agreement. And in *Riccio,* 1992 WL 281159 at * 3, the Court simply held, without detailed explication, that it was "necessary to evaluate the terms of the CBA to determine whether [plaintiff] was wrongfully discharged." As set forth above, it does not appear that the agents' claims will require construction of the CBA.

For all of these reasons, the Court determines that section 301 does not mandate preemption of the agents' retaliatory discharge claims. The Court will also address Schulte's related claim for emotional distress arising out of his allegedly wrongful termination, for which Prudential requested preemption for the first time in its reply brief. As Prudential appears to concede, Schulte's claims for retaliatory discharge and emotional distress arise out of the same facts and implicate the CBA to the same degree. Accordingly, the Court will also deny Prudential's request for preemption of Weaver's emotional distress claim.

## II. Defamation and Tortious Interference Claims

Weaver alleges that Prudential defamed him and interfered with his business relationships—both during and after his employment with Prudential—by informing individuals that Weaver was being investigated for unethical conduct, that he did not understand the insurance business, that he was inexperienced and that he "did not know what he was saying" when he told policyholders that Prudential had engaged in improper churning practices. (Weaver Resp. pp. 5, 13) Prudential argues that resolution of this claim requires interpretation of the CBA because the CBA establishes the contours of the relationships among Prudential, its agents and its policyholders, an understanding of which is necessary to evaluate Prudential's qualified privilege defense to the defamation action and to assess Weaver's reasonable expectations for purposes of the tortious interference claims. The Court will examine Weaver's defamation and tortious interference claims in turn.

### A. Tortious Interference

To set forth a claim under Illinois law for tortious interference with existing business relations, Weaver would have to show:

(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 154–55, 137 Ill. Dec. 19, 23, 545 N.E.2d 672, 676 (1989). To establish a cause of action for tortious interference with prospective business relations, he must show

(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.

*Fellhauer v. City of Geneva,* 142 Ill.2d 495, 511, 154 Ill.Dec. 649, 657, 568 N.E.2d 870, 878 (1991).

Prudential claims the Court cannot resolve the first element of either claim without referring to the CBA. Specifically, it contends that express and implied provisions of the CBA set forth the terms of the three-way relationship among Prudential, Prudential's agents and Prudential's policyholders. Prudential contends that the CBA prohibits the formation of contracts between its current agents and its policyholders by protecting all proprietary information regarding its policyholders and their insurance contracts and by making it clear that these contracts are between Prudential and its customers, not between agents and customers. It also points to provisions in the CBA which prohibit Prudential agents from selling or servicing other companies' insurance products while employed at Prudential. Finally, it notes that departed Prudential agents are (1) required to turn in all written information

they have received or generated regarding policyholders and their contracts and (2) precluded from soliciting Prudential policyholders for two years.

The Court agrees with Prudential that, in light of these express terms of the CBA, as well as the implied terms of the three-way relationship which may have developed thereunder, it will be impossible to determine the scope of Weaver's legitimate independent business relationships or reasonable business expectancies without construing the CBA.

In *Pelech,* 828 F.Supp. 525, the plaintiff asserted claims against three individuals for, among other things, tortious interference with her expectation of continued employment. The Court found that "[r]egardless of defendants' motivation for interfering with [plaintiff's] business expectancy ... litigation of this claim will necessarily involve the court in interpreting provisions of the collective bargaining agreement. At the very least, as a threshold issue, we will have to assess whether or not [plaintiff] had a valid business expectancy...." *Id.* at 533. The existence and extent of Weaver's actual or potential contractual relationships with Prudential policyholders or other potential insurance customers are no less dependent on an interpretation of the CBA than was the case in *Pelech.* Accordingly, Weaver's tortious interference claims are preempted and the Court will dismiss them.

 Ordinarily, dismissals on grounds of preemption are with prejudice. Here, however, Weaver has asserted that the CBA ceased to apply to him when he left Prudential's employ and that at least a portion of his claims arose after his termination. In response to this argument, Prudential cites *Merk v. Jewel Cos., Inc.,* 848 F.2d 761, 765 (7th Cir.1987), for the proposition that persons "covered by a collective bargaining agreement—even those no longer working— must exhaust their union remedies before filing suit." Although this response does not satisfactorily resolve the extent of the CBA's applicability to Weaver after his termination, Weaver was unable to cite any authority to delineate the CBA's post-termination reach—

nor did he specify the extent to which his claims arose after his termination. Accordingly, the Court will dismiss his tortious interference claims, but without prejudice.[21]

## B. Defamation

 Prudential argues that the Court will have to construe the CBA in order to evaluate Prudential's qualified privilege defense to Weaver's defamation claim. In *Kuwik v. Starmark Star Marketing and Admin., Inc.,* 156 Ill.2d 16, 27, 188 Ill.Dec. 765, 770, 619 N.E.2d 129, 134 (1993), the Illinois Supreme Court adopted the approach taken by the Restatement (Second) of Torts in determining whether a conditional privilege exists. To establish qualified privilege under this test, Prudential must show the Court that it made its allegedly defamatory statements on one of three types of "privileged occasion," defined as

(1) situations in which some interest of the person who publishes the defamatory matter is involved

(2) situations in which some interest of the person to whom the matter is published or of some other third person is involved

(3) situations in which a recognized interest of the public is concerned.

*Id.,* 156 Ill.2d at 29, 188 Ill.Dec. at 771, 619 N.E.2d at 135 (citation omitted).

Prudential claims it disclosed the alleged defamatory information to protect its own interests in maintaining relationships between itself and its policyholders. Prudential cites the same CBA sections it cites in defense of Weaver's tortious interference claim, *e.g.,* provisions allegedly making clear that Prudential's policyholders were to be regarded as Prudential's customers and not Weaver's, prohibitions against Weaver's use of customer information for any purposes other than selling Prudential products, and the provision barring solicitation of Prudential customers for two years following his termination.

 To show that a statement is conditionally privileged because it protects the

21. The Court notes, however, that Weaver's pleadings on these claims would appear vulnerable to other dispositive motions from Prudential as well.

publisher's interest, the defendant must show that the circumstances under which it was made would "induce a correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, *and* (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest." *Id.* (emphasis supplied), *quoting* Restatement (Second) of Torts § 594 (1977). Even assuming that the information Prudential allegedly imparted to its policyholders about Weaver affected the interests it cites, this Court fails to see how the policyholders' knowledge of the information could possibly have been of service to Prudential in protecting those interests. Accordingly, Weaver's claims for defamation are not preempted.[22]

In *Pelech,* 828 F.Supp. at 531, the plaintiff sued for sex discrimination, retaliatory discharge, and related claims, including a claim that defendants defamed her when "they accused her of theft and then published these accusations, along with allegations that Pelech was involved in illegal drug trafficking and an illicit affair with a married co-worker, to her fellow employees and tenants of the building where she worked." The Court found that evaluating the claim under Illinois law,

> in light of plaintiff's allegations and defendants' defenses, simply involves a determination of (1) whether Pelech did, or did not, steal a co-worker's calculator, (2) whether defendants did, or did not, publish statements that Pelech was engaged in drug trafficking, (3) whether the latter statements are true, and (4) whether defendants made the alleged statements with malice. Nothing in such an evaluation requires us to look to the [CBA], let alone interpret it.

*Id.* at 531. Although the Court noted that interpretation of a labor agreement might become necessary "where a defendant-em-

ployer claims qualified privilege, thus necessitating a review of the [CBA]'s terms to determine whether the disputed communications fell within the scope of defendant's duties," *id.* at 531 n. 8, in this case the Court has found that the alleged defamatory statements could not have fallen within the scope of Prudential's duties or the legitimate protection of its interests.

Moreover, as the *Pelech* Court noted, qualified privilege serves in large part to enhance the plaintiff's burden of proof under Illinois defamation law, requiring a showing of malice rather than simple negligence; accordingly, since the plaintiff in that case had alleged malice, the Court held that even if the defendants had asserted the qualified privilege as a defense it would have made no difference to the Court's determination that the defamation claim was not preempted. *Id. See also Evans v. Keystone Consol. Indus.,* 884 F.Supp. 1209, 1217 (C.D.Ill.1995) (noting in preemption context that plaintiff had "conceded" the qualified privilege issue as well as "pled around it by claiming ... actual malice"). Weaver, too, has alleged that Prudential acted with malice and not merely negligently. Accordingly, even if Prudential's qualified privilege defense did require this Court to consult the CBA, it would not provide grounds for preemption.

Other courts have declined to preempt claims for defamation. In *Mulligan v. United Parcel Service, Inc.,* 1995 WL 695097 (E.D.Pa.), in which a plaintiff sued for discharge in retaliation for filing a workers compensation claim as well as defamation and emotional distress arising out of the same event, the Court granted summary judgment for the defendant on the defamation claim on the ground of qualified privilege but did not preempt the claim on that ground.

The cases Prudential cites are distinguishable. In *Kozlowsky v. K–Mart Corp.,* 1990 WL 90537 (D.N.J.) (Wolin, J.), this Court

---

22. The Court also notes, although Prudential does not raise the issue, that the alleged statements were not made under circumstances giving rise to a conditional privilege for protection of the recipient's interest, either. To show that, Prudential would have had to show that the circumstances would "induce a correct or reasonable belief that (a) there is information that

affects a sufficiently important interest of the recipient or a third person, and (b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter." *Id., quoting* Restatement (Second) of Torts § 595 (1977). Prudential has not alleged that it had a legal duty to disclose the alleged defamatory material to its policyholders.

preempted a plaintiff's claim that his supervisor and fellow employees had defamed him during grievance proceedings, at an unemployment hearing and in other contexts. The statements at issue consisted of allegedly false allegations that the plaintiff had violated a certain company policy. According to the defendant, the policy was set forth in the CBA; according to the plaintiff, it did not exist. *Id.* at * 3. The Court therefore held that it could not "determine the falsity of the statements at issue without inquiring into the existence of a company policy" and that, although this inquiry "might very well begin outside the CBA, the Court remains convinced that all avenues of inquiry would ultimately lead to the CBA." *Id.* at * 3–* 4. Here, by contrast, the truth or falsity of the allegedly defamatory statements has nothing to do with the CBA.

Similarly, in *Hurst v. Consolidated Freightways Corp. of Delaware*, 1990 WL 43934 (M.D.Pa.), the defendant employer had discharged the plaintiff for failing a drug test. Plaintiff alleged that the test had been improperly administered in his case and sued for, among other things, defamation. The Court held that "the determination of whether the statements [the employer] made were defamatory requires an interpretation of the [CBA] and the Testing Procedure." *Id.* at * 4. In other words, whether the defendant's statements regarding the plaintiff's termination were or were not defamatory depended upon the Court's determination of whether or not the testing procedure used complied with the procedures set forth in the relevant CBA. *See also Stallard v. B–Line Sys., Inc.*, 799 F.Supp. 924, 926 (S.D.Ill.1992) (defamation claim preempted where offending statements involved allegations that plaintiff had violated rules adopted pursuant to collective bargaining agreement).

Both *DeCoe*, 32 F.3d 212, and *Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620 (8th Cir.1989), involved allegations of defamatory statements made in the context of procedures or proceedings specifically authorized or mandated by collective bargaining agreements. In *DeCoe*, the plaintiff alleged that co-workers defamed him by bringing unfounded sexual harassment charges against

him with political motives. The Court found that the plaintiff could not establish essential elements of his claim without substantial reference to provisions in the collective bargaining agreement regarding sexual harassment procedures because his claim, essentially, was that his co-workers had "exceeded the scope of CBA-imposed rights and duties, in their attempts to prosecute sexual harassment allegations." *Id.* at 216.

Similarly, in *Johnson*, the plaintiff alleged that co-workers defamed him by falsely reporting that he had slashed the tires of a fellow employee during business hours in the workplace parking lot. Since the allegedly false report was made as part of the employer's investigation under collective bargaining agreement provisions, the Court preempted the plaintiff's claims insofar as they arose out of statements made within the company. *Johnson*, 876 F.2d at 624. It did not, however, preempt the plaintiff's claim against the victim of the tire-slashing episode for statements to his insurance company. *Id.* at 624–25.

In this case, the alleged defamatory statements were not even arguably made as part of any procedure or proceeding carried out pursuant to the CBA. Prudential does not claim that any provision specifically authorized or required it to inform its policyholders that Weaver was being investigated for ethical violations or to share with its policyholders its views on Weaver's knowledge, competence or job performance.

*Furillo v. Dana Corp. Parish Div.*, 866 F.Supp. 842 (E.D.Pa.1994), has little relevance to this case because it involved allegedly defamatory statements uttered during a grievance hearing. Courts have been quick to preempt state defamation claims based upon statements made during such proceedings to avoid reexamining issues already addressed by the arbitrator. *See id.* at 852; *Kozlowsky*, 1990 WL 90537 at * 4.

Accordingly, the Court finds that Weaver's defamation claim is not preempted by section 301 and will allow the claim to proceed on the merits.

## CONCLUSION

For the foregoing reasons, the Court will deny Prudential's motion to compel arbitration and stay these proceedings. It will grant Prudential's motion to dismiss, without prejudice, Weaver's claims for tortious interference with business relations on the ground that section 301 preempts them, but will deny Prudential's motion to dismiss Weaver's defamation claim, Schulte's claim for emotional distress, and the retaliatory discharge claims of Weaver, Schulte and Gordon.

An appropriate Order is attached.

### *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 19th day of April, 1996

ORDERED that the motion of The Prudential Insurance Company of America ("Prudential"), to compel arbitration and stay these proceedings, is denied; and it is further

ORDERED that Prudential's motion to dismiss plaintiff Michael R. Weaver's ("Weaver") claims for tortious interference with business relations is granted, without prejudice; and it is further

ORDERED that Prudential's motion to dismiss Weaver's defamation claim is denied; and it is further

ORDERED that Prudential's motion to dismiss plaintiff Herbert Schulte's ("Schulte") claim for emotional distress is denied; and it is further

ORDERED that Prudential's motion to dismiss the retaliatory discharge claims of plaintiffs Weaver, Schulte and Michael D. Gordon, is denied; and it is further

ORDERED that the age discrimination claim of Schulte is dismissed with prejudice.